KAN KAM LIN et al., Plaintiffs,

v.

Dominick RINALDI, as District Director of the Immigration and Naturalization Service of New Jersey, and William P. Rogers, as Secretary of State of the United States of America, Defendants.

LAM, YI KAM, Plaintiff,

v.

Dominick RINALDI, as District Director of the Immigration and Naturalization Service of New Jersey, and William P. Rogers, as Secretary of State of the United States of America, Defendants.

YU FUNG CHENG and Hi Pan Chan, Plaintiffs,

v.

Dominick RINALDI, as District Director of the Immigration and Naturalization Service of New Jersey, and William P. Rogers, as Secretary of State of the United States of America, Defendants.

YEUNG YAN CHEUNG, Plaintiff,

v.

Dominick RINALDI, as District Director of the Immigration and Naturalization Service of New Jersey, and William P. Rogers, as Secretary of State of the United States of America, Defendants.

Civ. A. Nos. 1823–72, 1862–72, 167–73 and 282–73.

United States District Court, D. New Jersey.

July 3, 1973.

Allan S. Berger, East Orange, N. J., for plaintiffs; Lebenkoff & Coven by Jules E. Coven, New York City, of counsel.

Herbert J. Stern, U. S. Atty., by Stephen E. King, Asst. U. S. Atty., for defendants.

OPINION

WHIPPLE, District Judge:

These matters are before the Court pursuant to the petitioners' motion for a preliminary injunction staying their deportation pending the outcome of this litigation and the defendants' counter motion for summary judgment. Plaintiffs, who are all Chinese alien seamen, after being declared deportable on various dates, sought asylum from the Secretary of State and were denied. Petitioners' arguments will be treated with

specificity later on in this Opinion, but first, in the interest of clarity, the Court will identify the parties.

## PARTIES

Kan Kam Lin (Civil Action No. 1823–72), who is a native of the Republic of China, entered the United States as a nonimmigrant crewman on or about November 12, 1968. On April 21, 1971, the Immigration and Naturalization Service (INS) ordered, as a result of a deportation hearing, the plaintiff to voluntarily depart the United States since his presence here was unlawful. That order further provided that, should the plaintiff refuse to voluntarily depart, he would be deported.

Subsequent to the aforesaid order, plaintiff filed an Application for Asylum or Temporary Refuge with the INS. He stated that that application was made pursuant to the provisions of a certain Policy Statement issued by the Department of State on January 4, 1972.[1] At the same time, plaintiff requested a stay of deportation, see 8 C. F.R. § 243.4, pending a determination on the request for asylum. The application for a stay was granted and the request for asylum was forwarded to the State Department by letter on May 19, 1972.

On June 6, 1972, the State Department made a determination that they found no reason to grant plaintiff temporary refuge or asylum. On October 19, 1972, INS communicated this denial to the plaintiff and his attorney. The reason for the denial was that Lin had failed to establish that he would be persecuted on account of race, religion or

---

1. The Policy Statement in question provides in pertinent part:

"Part I—General Policy for Dealing With Requests for Asylum by Foreign Nationals

POLICY. Both within the United States and abroad, foreign nations who request asylum of the U.S. Government owing to persecution or fear of persecution should be given full opportunity to have their requests considered on their merits. The request of a person for asylum or temporary refuge shall not be arbitrarily refused by U.S. personnel. Because of the wide variety of circumstances which may be involved, each request must be dealt with on an individual basis, taking into account humanitarian principles, applicable laws and other factors.

In cases of such requests occurring within foreign jurisdiction, the ability of the U.S. Government to give assistance will vary with location and circumstances of the request.

U.S. OBJECTIVES. A basic objective of the United States is to promote institutional and individual freedom and humanitarian concern for the treatment of the individual.

Through the implementation of generous policies of asylum and assistance for political refugees, the United States provides leadership toward resolving refugee problems.

Background. A primary consideration in U.S. asylum policy is the "Protocol Relating to the Status of Refugees," to which the United States is a party. The principle of asylum inherent in this international treaty (and in the 1951 Refugee Convention whose substantive provisions are by reference incorporated in the Protocol) and its explicit prohibition against the forcible return of refugees to conditions of persecution, have solidified these concepts further in international law. As a party to the Protocol, the United States has an international treaty obligation for its implementation within areas subject to jurisdiction of the United States. U.S. participation in assistance programs for the relief of refugees outside U.S. jurisdiction and for their permanent resettlement in asylum or other countries helps resolve existing refugee problems. It also avoids extensive accumulation of refugees in asylum countries and promotes the willingness of the latter to maintain policies of asylum for other arriving refugees.

President Nixon has reemphasized the U.S. commitment to the provision of asylum for refugees and directed appropriate departments and agencies of the U.S. Government, under the coordination of the Department of State, to take steps to bring to every echelon of the U.S. Government which could possibly be involved with persons seeking asylum a sense of the depth and urgency of our commitment."

political opinion if he were deported to Hong Kong.[2]

Lin and two others filed their complaint and Order to Show Cause in this Court on November 10, 1972. An application for a preliminary injunction was heard by the Honorable Leonard I. Garth of this district and, on December 18, 1972 an Order was entered remanding numbers 1823–72 and 1862–72 to the District Director of INS for his consideration of plaintiff's request for asylum in light of the terms of the Protocol Relating to the Status of Refugees.

On February 5, 1973 the District Director of INS advised the plaintiff that he did not fall within the ambit of the Protocol.[3] Plaintiff was on the same date noticed that his deportation would take place on February 20, 1973. On February 16, 1973 another Order to Show Cause was entered seeking another preliminary injunction. On March 5, 1973, the defendants filed their motion for summary judgment pursuant to Fed.R.Civ.P. 56. Both motions were heard on March 26, 1973.

Yi Chun Cheng (Civil Action No. 1823–72) is a native of the Republic of China and entered the United States on or about November 26, 1969. At that time he was the holder of a valid Hong Kong Seaman's Identity book. He was refused permission to leave his ship and thereafter entered the United States illegally. On November 5, 1971, INS, after a deportation hearing, ordered Cheng to voluntarily depart the United States on or before December 15, 1971. The Order further specified that, failing voluntary departure, plaintiff would be deported to either Formosa or Hong Kong.

Subsequent to the November 5th order of INS, plaintiff sought and was granted a stay of deportation based on the fact that he had requested asylum or temporary refuge from the Department of State. The request for asylum or

2. The entire letter reads as follows:

October 19, 1972

Mr. LIN Kan Kam
228 No. 6th Street
Newark, New Jersey 07107
Dear Sir:

Reference is made to your request of April 24, 1972 for asylum or temporary refuge.

After careful consideration and consultation with the Department of State, it has been concluded that you have failed to establish that you would be persecuted on account of race, religion, or political opinion if returned to Hong Kong. Therefore arrangments are again being made to effect your deportation.

You will be further advised concerning those arrangements.

Very truly yours,
G. E. Branch
Assistant District Director
for Deportation

cc: Jules E. Coven, Esquire
1 East 42nd St.
New York, New York

3. That letter states as follows:

February 5, 1973

Mr. LIN Kan Kam
228 No. 6th Street
Newark, New Jersey 07107
Dear Sir:

Reference is made to your request for political asylum and temporary refuge in the United States pursuant to the terms of the Treaty "Protocol Relating to the Status of Refugees" and the Policy Statement of the Secretary of State of January 4, 1972.

After careful consideration and consultation with the Department of State, it has been concluded that you should not be exempted from regular Immigration procedures since you have failed to establish, pursuant to Article 32(1) of the Treaty, that you are lawfully in the United States and that pursuant to Article 1(A)(2) you would be persecuted on account of race, religion, nationality, membership of a particular social group or political opinion, if returned to Hong Kong.

Therefore, arrangements are again being made to effect your deportation. Your attention is directed to the enclosed notice concerning these arrangements.

Sincerely,
Dominick F. Rinaldi
District Director

Enc.

cc: Jules E. Coven, Esquire
1 East 42nd Street
New York, New York 10017

temporary refuge was denied by letter dated October 5, 1972 from the Department of State to INS. The denial was communicated to the plaintiff and his attorney by letter dated October 30, 1972.

Cheng thereafter joined Lin and Fong Ching Siu as a plaintiff in Civil Action 1823–72. The procedural history of that case has already been recounted.

Fong Ching Siu (Civil Action No. 1823–72) is a native of mainland China and entered the United States as a crewman on or about May 5, 1971. Siu was a resident of Hong Kong from 1967 to 1971. In a sworn statement to INS he admitted that he entered the United States without the permission of the proper authorities. On June 25, 1971, a Special Inquiry Officer made a determination that Siu was unlawfully in the country and was to be deported to Hong Kong if he did not voluntarily depart the United States on or before July 25, 1971. Plaintiff did not comply and on June 13, 1972, after a warrant of deportation had been issued, he applied for asylum or temporary refuge and a stay of deportation. The stay was granted, but the plaintiff was notified by letter dated October 27, 1972 that his request for asylum had been denied. Siu then joined Lin and Cheng as a plaintiff in Civil Action No. 1823–72.

Yi Kam Lam (Civil Action No. 1862–72) is a native of Foochow, China and lived there from birth until 1952. He entered the United States through Savannah, Georgia on or about February 5, 1970. He was admitted as a nonimmigrant crewman and was permitted to remain while his ship was in port, but in no event for longer than 29 days. *See* § 252(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1282(a); 8 C. F.R. § 252.1(d)(1). Plaintiff failed to depart and on January 12, 1972 was served with an Order to Show Cause why he should not be deported.

On March 3, 1972, a hearing was held wherein Lam admitted that he was in the country illegally and requested permission to depart voluntarily to Hong Kong. He was ordered to depart on or before July 19, 1972. On that date, however, the plaintiff applied for a stay on the grounds that he had requested asylum or temporary refuge. A stay was granted until August 31, 1972. On October 26, 1972, the District Director informed Lam that his request had been denied.

Lam filed his complaint in Civil Action No. 1862–72 on November 17, 1972 and that matter was also ordered remanded by Judge Garth on December 18, 1972. On February 5, 1973, the plaintiff was notified that his request for asylum had again been denied. Lam was ordered to be deported on February 20, 1973, but the present motions have intervened.

Yu Fung Cheng (Civil Action No. 167–73) is a native and citizen of the Republic of China and entered the United States through New Orleans as an alien seaman on or about December 29, 1970. He failed to depart with his vessel at that time and did not present himself to the immigration authorities. On January 7, 1972 at his hearing plaintiff admitted that he was in the United States illegally and sought to be allowed to depart voluntarily.

On November 9, 1972 plaintiff filed his application for asylum or temporary refuge and a stay of deportation until December 15, 1972 was granted on that basis. After receiving a recommendation from the Department of State that the request for asylum should be denied, INS communicated that denial to the plaintiff by letter dated February 1, 1973. Cheng filed his complaint in this court on February 7, 1973 and was not before Judge Garth in December but, other than the possible ramifications of the remand order, the issues are substantially the same.

Hi Pan Chan (Civil Action No. 167–73) is a native and citizen of China who entered the United States through Long View, Washington on or about November 4, 1971. At that time he was autho-

rized to remain as long as his ship was in port, but in no event longer than 29 days. Plaintiff failed to depart and on January 28, 1972 was served with an order to show cause why he should not be deported.

A hearing was conducted on March 3, 1972 at which time plaintiff admitted through his attorney that he was illegally in the country and requested voluntary departure to Hong Kong. On June 14, 1972 Chan submitted his request for asylum or temporary refuge pursuant to the Protocol. On August 14, 1972 the State Department notified INS by letter that the request for asylum should be denied. The denial was then telephonically communicated to the plaintiff's attorney. Chan thereafter joined as a plaintiff in Civil Action No. 167–73 which was filed on February 7, 1973.

Plaintiff Yeung Yan Cheung (Civil Action No. 282–73), a native and citizen of China, entered the United States through Los Angeles on or about October 27, 1970. Thereafter, Cheung was served with an order to show cause why he should not be deported and a hearing was held on May 19, 1972. Plaintiff admitted he was illegally in the country at the hearing and was given until June 19, 1972 to voluntarily depart.

Plaintiff failed to voluntarily depart and made his application for asylum or temporary refuge on September 26, 1972. On the same date he applied for a stay of deportation which was granted. By letter dated November 2, 1972, the State Department notified INS that it did not deem asylum warranted. The denial was communicated to the plaintiff by letter dated February 15, 1973. He was on the same date noticed that he would be deported on March 1, 1973. On February 28, 1973 Cheung filed Civil Action No. 282–73.

■■ The plaintiffs assert that jurisdiction exists pursuant to 5 U.S.C. §§ 702–706, 8 U.S.C. § 1329 and 28 U.S.C. § 2201 et seq. Jurisdiction is not contested by the defendants, but that fact does not, of course, obviate the Court's examination. 8 U.S.C. § 1329 provides in pertinent part:

> The district courts of the United States shall have jurisdiction of all causes, civil and criminal arising under any of the provisions of this subchapter.

This statute was held to confer jurisdiction on a district court to hear the motion of the plaintiff to enjoin the enforcement of a warrant of deportation in Buckley v. Gibney, 332 F.Supp. 790 (S.D.N.Y., aff'd, 449 F.2d 1305 (2nd Cir. 1971), cert. denied, 405 U.S. 919, 92 S.Ct. 946, 30 L.Ed.2d 789 (1972).

Further, this case is not one which would come within the purview of 8 U.S.C. § 1105a so that the Third Circuit Court of Appeals would possess original jurisdiction. Since the action complained of was not entered during the course of an immigration hearing, nor issued upon a motion to reopen proceedings, the matter is properly before this Court. Cheng Fan Kwok v. Immigration and Naturalization Service, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968).[4]

---

4. The jurisdiction of the Circuit Court of Appeals, as defined by the Supreme Court in recent years, was reviewed in Pilapil v. Immigration and Naturalization Service, 424 F.2d 6, 8–9 (10th Cir. 1970) as follows:
"The jurisdictional reach of § 1105a has been considered on three occasions by the Supreme Court. Acknowledging the statutory language "[t]he procedure * * * shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation * * * made against aliens within the United States * * * except that—," the court expanded the reach of the exclusive jurisdiction in the Court of Appeals to include a request made in the course of a section 242(b) deportation proceeding, 8 U.S.C. § 1252(b), for a suspension of deportation under section 244(a)(5), 8 U.S.C. § 1254 (a)(5), (1964). *Foti* [v. Immigration and Naturalization Service], *supra* [375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281]; Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) decided that

The posture of these cases presents the somewhat unusual situation in which this Court must review the decision of the Secretary of State to deny asylum. Before treating that issue, however, the Court will consider the intervening motion of the defendants for summary judgment which takes logical precedence.

The United Nations Protocol Relating to the Status of Refugees (hereinafter referred to as the Protocol) was approved by the Senate on October 4, 1968 and entered into force with respect to the United States on November 1, 1968. Article 1 of the Protocol provides in pertinent part:

> 1. The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention to refugees as hereinafter defined.

The "Convention" referred to is the 1951 Geneva Convention Relating to the Status of Refugees (hereinafter referred to as the Convention).

Article I of the Convention as modified by Article I of the Protocol defines the term refugee as

> Any person who, . . . owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country, or who, not having a nationality and being outside the country of his former habitual residence, is unable or, owing to such fear, is unwilling to return to it.

Article 32 of the Convention, which is incorporated by the Protocol, provides in pertinent part:

### EXPULSION

> 1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.

Article 33 of the Convention, as incorporated by the Protocol, provides:

### PROHIBITION OF EXPULSION OR RETURN

### ("REFOULEMENT")

> 1. No contracting state shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened . . .

The defendants' argument on its Rule 56 motion is two pronged. They contend that (1) plaintiffs are not "refugees" within the stated provisions and (2) plaintiffs are not "lawfully in [the] territory" as required by Article 32 of the Convention. The Court will consider the second contention first.

It is patently clear that, if the plaintiffs are not lawfully in the United States, they take nothing from the terms of the treaty. Additionally, since the facts as to their entry and continued stay are well established (and further, since the illegality of the plaintiffs'

---

the Court of Appeals also has exclusive jurisdiction to review a denial of a motion to reopen a section 242(b) proceeding. In Cheng Fan Kwok v. Immigration & Naturalization Service, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968) it was held that the exclusive jurisdiction of the Court of Appeals was limited to orders arising from the proceedings for deportation provided in section 242(b). We are limited by these to review questions arising from the proceedings as reflected in the administrative record."

This Court is cognizant of the plaintiffs' ardent efforts to vest this Court with jurisdiction. Mindful of the *Foti-Giova-* *Fan-Kwok* trilogy, they have scrupulously avoided taking any action which would place this case within the ambit of § 1105a. They have not appealed the original decision, they have not moved to reopen, and they have not sought relief from the Attorney General under § 243(h) of the Act, 8 U.S.C. § 1253(h). A review of the cases in the immigration field connotes that courts must guard against dilatory tactics by astute counsel. The Court suspects such activity in this case but, in view of the present status of the law, is helpless to prevent plaintiffs' extra bite at the proverbial apple.

presence was established at the administrative stage), summary judgment could properly be granted in favor of the defendants since the definition of this term is a purely legal issue. Asuncion v. District Director of United States Immigration and Naturalization Service, 427 F.2d 523 (9th Cir. 1970); Associated Hardware Supply Co. v. Big Wheel Distributing Co., 355 F.2d 114 (3d Cir. 1965).

Resolution of the issue, however, is not a simple matter. The Court is aware of only two cases which have even tangentially touched on the specific question. See Immigration and Naturalization Service v. Stanisic, 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); Muskardin v. Immigration and Naturalization Service, 415 F.2d 865, 867 (2nd Cir. 1969).

*Stanisic* involved a situation where a Yugoslav crewman entered the country on a conditional landing permit and, during the period that this permit was valid, *see* 8 C.F.R. § 252.1(d)(1), appeared at the Portland, Oregon office of the INS and claimed that he feared persecution if he was returned to Yugoslavia. In accordance with § 252(b) of the Immigration and Nationality Act, 8 U.S.C. § 1282(b), the petitioner's permit was revoked and he was given an opportunity to present evidence why he should not be deported. One of the issues before the Supreme Court was whether the case should be remanded in view of an intervening amendment to § 243(h) of the Act, 8 U.S.C. § 1253(h).[5] Because the statute had been amended to the extent that an alien had the burden of showing that he would suffer "persecution on account of race, religion, or political opinion" rather than "physical persecution", the Court remanded to the District Director for a new hearing under the appropriate standard. In so doing, the Court noted:

Respondent contends that his 1965 proceeding was infected with various constitutional errors, including the District Director's alleged bias and his combination of prosecutorial, investigative, and adjudicatory functions. Because the proceeding is not before us, and because we remand for a new hearing, we have no occasion to consider these arguments, except to note that neither § 252(b) of the Immigration and Nationality Act nor 8 CFR § 253.1(f), under which respondent will be heard on remand, is unconstitutional on its face. *Likewise, it is premature to consider whether, and under what circumstances, an order of deportation might contravene the Protocol and Convention Relating to the Status of Refugees, to which the United States acceded on November 1, 1968.*

395 U.S. 62, 79–80 n. 22, 89 S.Ct. 1519, 1529, 23 L.Ed.2d 101 (emphasis added).

The Court thus foresaw the potential discrepancies between the terms of the Protocol and the terms of § 243(h). In this Court's view, however, one of the "circumstances" of which the Supreme Court spoke must be the lawfulness of the alien's presence. Plaintiffs contend that the term cannot be defined as "lawfully in the territory pursuant to the immigration laws of that territory". Such a construction, argue plaintiffs, would render the Protocol nugatory since, if an alien were in the country in accordance with the immigration laws, he would have no reason to attempt to avail himself of the benefits of the Protocol. The simple answer to this assertion, of course, is that individuals who are lawfully but temporarily present could apply for asylum under the terms of the Protocol.[6]

One case at the administrative level has dealt with the specific issue in ques-

5. Immigration and Nationality Act § 243 (h), 8 U.S.C. § 1253(h) (1965), formerly Ch. 5, § 243, 66 Stat. 212 (1952).

6. This group would include alien seaman *while* their ship is in port and *before*

the 29 day period has elapsed, see 8 C.F.R. § 252.1(d)(1) and INS v. Stanisic, 395 U.S. 62, 65–67, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969).

tion. In In re D——————, Board of Immigration Appeals, Interim Dec., File No. A14 616 395 (April 17, 1973), the Board of Immigration Appeals was presented with an appeal from the decision of an immigration judge finding the petitioner to be a deportable alien and denying his petition for a withholding of deportation under § 243(h). The issue in D—————— was whether the alien came within the terms of the Protocol and one of the sub-issues was the definition of "lawfully within the territory". Based on the legislative history of the pronouncement, both in the national and international context, the Board held that an immigrant who violates the terms of his initial entry into the country could not be considered lawfully in the territory under the Protocol.

In addition to the relevant legislative history in the United States Congress,[7] it seems abundantly clear that the intent of the drafters of the provisions in question was that "lawfully in the territory" was to be construed as the defendants suggest. In one of its early reports, the Committee which

7. When the Protocol was being considered by the Senate Committee on Foreign Relations, the following testimony was elicited from a representative of the Treaty Section of the Department of State:
"There are two categories, only two, that we think are not covered, and those are the deportation of an alien for reasons of mental illness or deficiency, where he has become institutionalized for that reason, or deportation on grounds that he has become a public charge. These two areas would not be enforced against refugees if the Protocol were in force."
Appendix 90th Cong., 2nd Sess., Executive Report No. 14, Protocol Relating to Refugees, September 30, 1968 at 8. (hereinafter cited as Report).
In his letter of submittal to the President, the Secretary of State commented on Article 32 as follows:
". . . Article 32(1) of the Convention provides that, 'The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.' Many if not most of the grounds for deportation set forth in Section 241 of the Immigration and Nationality Act, 8 U.S.C. § 1251, are grounds of 'national security or public order,' including particularly the several provisions relating to subversive activities and criminal conduct. As refugees by definition are without a homeland, deportation of a refugee is a particularly serious measure, and it would not be humanitarian to deport a refugee for reasons of health or economic dependence."
In testimony before the Senate Committee on Foreign Relations, Laurence A. Dawson, Acting Deputy Director of the Office of Refugee and Migration Affairs, Department of State, stated as follows:
". . . [W]hile the concept of guaranteeing safe and humane asylum is the most important element of the Protocol, accession does not in any sense commit the contracting state to enlarge its immigration measures for refugees. Rather, the asylum concept is set forth in the prohibition against the return of a refugee in any manner whatsoever to a country where his life or freedom would be threatened; and the prohibition under Article 32 against the deportation of a refugee lawfully in the territory of a Contracting State to any country except in cases involving national security or public order. The deportation provisions of the Immigration and Nationality Act, with limited exceptions, are consistent with this concept. The Attorney General will be able to administer such provisions in conformity with the Protocol without amendment of the Act."
Report at 6.
The following colloquy between Senator Sparkman, Chairman of the Committee, and Mr. Dawson is also enlightening:
"SENATOR SPARKMAN. I want to make certain of this: Is it absolutely clear that nothing in this protocol, first, requires the United States to admit new categories or numbers of aliens?
MR. DAWSON. That is absolutely clear.
* * * * *
SENATOR SPARKMAN. And no requirement of new categories or numbers of aliens?
MR. DAWSON. That is correct, sir."
Report at 19.
In conformity with the testimony before the Committee, Senator Mansfield, at the time of the Protocol's submission to the Senate stated: "It is understood that the Protocol would not impinge adversely upon the Federal and State laws of this country." 114 Cong.Rec. 12,021 (daily ed. Oct. 3, 1968).

drafted Article 32 on behalf of the United Nations stated:

> The expression "lawfully within their territory" throughout this draft Convention would exclude a refugee who while lawfully admitted has overstayed the period for which he was admitted or was authorized to stay or who has violated any other condition attached to his admission or stay.

Ad Hoc Committee on Statelessness and Related Problems, Report, U.N.E.C.O.S. O.C. at 47, U.N. Doc. E/1618/Corr. 1; E/AC.32/5/Corr. 1 (March 2, 1950). After further analysis and familiarization of the possible problems involved, the same Committee stated:

> The Committee decided that it was not always necessary to insert in the text definitions of expressions used. However, since some question was raised as to the phrase "lawfully in the territory", the Committee expressed the view that, in any event, a Contracting State may consider that a refugee is no longer lawfully in its territory if he is in contravention of terms imposed as a condition of his admission or sojourn.

Ad Hoc Committee on Statelessness and Related Problems, Report, U.N.E.C.O.S. O.C. at 11, U.N. Doc. E/1850; E/AC. 32/8.

The Court has been cited to no authority, nor could it find any which would support a different construction of these terms.[8] Furthermore, it is apparent that, should aliens be granted asylum on the basis of possible persecution with no regard to the legality of their entry, the present immigration laws and quotas imposed by this country would be devastatingly effected. For these reasons, then, it is the view of this Court that the terms "lawfully in the territory" contained in Article 32 of the Protocol and the Convention are coextensive with the orthodox theories of legal presence under the present immigration laws. Such a finding, however, does not necessarily dictate any rush to summary judgment, especially in areas which are so procedurally sensitive as immigration and naturalization law.

■ The plaintiffs' petition for asylum was not made pursuant to § 243(h) of the Act, although the Court notes that the application is certainly akin to

---

8. Plaintiffs cite a statement made by a Mr. H. L. Hardin, Assistant Commissioner, Inspections, Immigration and Naturalization to the May 25, 1972 Conference of Association of Immigration and Nationality Lawyers in New Orleans, Louisiana:

"In determining whether a refugee is 'lawfully in the territory' of a Contracting State, regard must be had to all the circumstances of his presence there, and in this respect the manner in which he originally entered the territory, i. e. lawfully or unlawfully, is not the only decisive factor."

Mr. Hardin, however, was quoting from a letter dated May 26, 1971 from the Deputy Representative of the United Nations High Commissioner for Refugees. That letter, in turn, quoted directly from advice received from the Geneva headquarters of that organization. The second paragraph of that letter sheds some explanatory light on the first:

"Art. 31 of the 1951 Convention recognizes the possibility that the status of a refugee who has entered illegally the territory of a Contracting State may subsequently be regularized. Conversely, the stay of a refugee who has entered in a regular manner, may subsequently become unlawful. This would for example be the case—if the authorities of the country are not prepared to grant him residence beyond the *limited-period* for which he was admitted or if they withdraw his residence permission on the ground that he has not complied with the *conditions* under which he was admitted, e. g. to pursue his studies. As long as his stay is 'lawful,' even though admitted temporarily, he can only be expelled on grounds of 'national security and public order.' If, however, his stay ceases to be 'lawful' in the circumstances described above, he is no longer 'lawfully in the territory of the Contracting State' and may therefore not invoke the special protection of Art. 32 of the 1951 Convention." (Emphasis in original).

a petition under that section. If such an application had been made, the matter of their entitlement to a hearing would, of course, be a serious question before this Court. *See Stanisic, supra*; Kerkai v. Immigration and Naturalization Service, 418 F.2d 217 (3d Cir. 1969), cert. denied, 397 U.S. 1067, 90 S. Ct. 1506, 25 L.Ed.2d 688 (1970). All of the plaintiffs have had deportation hearings on the question of the legality of their presence and had that issue determined against them (in many cases that finding was based on their own admission). That finding, since plaintiffs have either waived their right of appeal or not appealed within the time required by the appropriate regulations,[9] cannot now be attacked by them. Luna-Benalcazar v. Immigration and Naturalization Service, 414 F.2d 254 (6th Cir. 1969). Any further hearing of this matter at the administrative level then would be superfluous. An inquiry into the question of possible persecution under the provisions of the Treaty would also be unwarranted, of course, in view of this finding of unlawfulness of presence.

■■ This Court's review of immigration proceedings is limited to a determination of whether the action taken below was arbitrary, capricious or illegal. Biggin v. Immigration and Naturalization Service, 479 F.2d 569 (3d Cir. 1973). In view of the construction this Court has placed on the pertinent terms of the Protocol, it must uphold the decision of the District Director as not being arbitrary or capricious. In the view of this Court, there is no reason for applying any different standard of review in this case, although the procedural history is somewhat unusual.

*Compare* Shkukani v. Immigration and Naturalization Service, 435 F.2d 1378 (8th Cir.), cert. denied, 403 U.S. 920, 91 S.Ct. 2237, 29 L.Ed.2d 698 (1971).

It is the decision of this Court that the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 shall be granted against all plaintiffs in all actions herein considered. No costs.

---

9. 8 C.F.R. § 242.21 provides in pertinent part:

"Pursuant to Part 3 of this chapter an appeal shall lie from a decision of a special inquiry officer under this part to the Board of Immigration Appeals. An appeal shall be taken within 10 days after the mailing of a written decision, or the stating of an oral decision, or the service of a summary decision on Form I-38 or

Form I-39. The reasons for the appeal shall be stated briefly in the Notice of Appeal, Form I-290A; failure to do so may constitute a ground for dismissal of the appeal by the Board. When service of the decision is made by mail, as authorized by this section, 3 days shall be added to the period prescribed for the taking on an appeal."