Julio CISTERNAS–ESTAY and Doris Cisternas-Estay, Petitioners,

v.

IMMIGRATION AND NATURALIZATION SERVICE.

No. 75–1261.

United States Court of Appeals, Third Circuit.

Argued Oct. 29, 1975.

Decided Feb. 25, 1976.

Rehearing En Banc Denied March 22, 1976.

As Amended May 14, 1976.

---

11. *Id.* at 46, 70 S.Ct. at 452, 94 L.Ed. at 626.

James J. Orlow, Wasserman, Orlow, Kaye & Rubin, Philadelphia, Pa., for petitioner.

James P. Morris, Bowie, Md., John L. Murphy, Chester J. Halicki, Dept. of Justice, Washington, D. C., Gary Tilles, Asst. U. S. Atty., Philadelphia, Pa., for respondent.

Before GIBBONS, BIGGS and WEIS, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

Cisternas-Estay petitions for review of an order by the Board of Immigration Appeals dismissing an appeal of Cisternas-Estay and his wife, in which it was contended that they were entitled to suspension of deportation under section 243(h) of the Immigration and Nationality Act of 1952, (INA), 8 U.S.C. § 1253(h). Four issues of law present themselves. The first goes to the applicability of the Administrative Procedure Act of 1966, (APA), 5 U.S.C. § 500 *et seq.,* to the review by the Board of a section 242 deportation determination. The second concerns whether the determination that

the Cisternas-Estays did not carry their burden under section 243(h) was an abuse of discretion. The third goes to whether the immigration judge and the Board were in error because they did not consider an amendment to regulation 8 CFR § 242.8, "authorizing" them to take into account in section 242 deportation proceedings articles 32 and 33 of the United Nations Convention Relating to the Status of Refugees, 1967 Protocol, Jan. 31, 1967 [1967] 19 U.S.T. 6223, T.I.A.S. No. 6577. The amendment occurred three months prior to the filing of the immigration judge's opinion. Finally, there is a question whether the couple were granted de facto asylum due to the approximately two and one-half years delay in processing their request for asylum.

## FACTS

Cisternas-Estay and his wife, citizens of Chile, were married within one day of their entry into the United States on a visitor for pleasure visa on March 13, 1971. Their passports indicated they were single persons.[1] Cisternas-Estay was authorized to stay approximately five and one-half months; his wife for one and one-half months. In August of 1971, near the end of the stay permitted by his visa, Cisternas-Estay applied for asylum for both.[2] This application was denied by the Immigration and Naturalization Service in February of 1974, approximately two and one-half years after it was filed and five months after the fall of the Allende government, which, the

Cisternas-Estays argued in their request, would persecute them on their return to Chile.[3]

The district director of the Service in making this determination relied in part on a letter from the Office of Refugee and Migration Affairs of the Department of State dated on November 26, 1973.[4] Commenting on this and three other asylum requests, that letter noted that the Allende government in Chile had been removed from power. The letter argued there was no basis for granting political asylum. The letter closed, "We hope the Service will be sympathetic to individual hardship cases such as those where an American citizen child is involved." The Cisternas-Estays have one child, born in the United States, approximately one month after visa expired and before the request for asylum and the Service's decision.

The basis of the Cisternas-Estays' request for asylum was an unspecified "political problem" with the Allende government. However, a month and one-half after the Service denied the asylum request and sixteen days before the Cisternas-Estays' deportation hearing on April 10, 1974, they and their counsel held a press conference, where Cisternas-Estay read a very brief statement attacking the denial of liberties in Chile under the regime *succeeding* the Allende government. It is this statement that the aliens claim will result in a loss of Chilean citizenship and leave them open to criminal action on return under a junta

---

1. This is asserted in the Immigration and Naturalization Service's brief and has not been controverted by opposing counsel. We point out however that uncontroverted statements of counsel should not be considered part of the record. *See Wood v. Zapata Corp.,* 482 F.2d 350, 358 (3d Cir. 1973) (dissenting opinion); *United States v. Bowles,* 331 F.2d 742, 746 n.11 (3d Cir. 1964).

2. The immigration judge found that Mrs. Cisternas-Estay's asylum claim was entirely dependent upon that of Mr. Cisternas-Estay. Adm.Rec., p. 26. This is not in dispute here.
   In August 1971 Mrs. Cisternas-Estay's request for an extension of her original visa was denied and she was given until September 10, 1971 to depart voluntarily.

3. The district director's letter denying the request does not appear in the record. We rely on the immigration judge's finding of fact, Adm.Rec., p. 25, the transcript of Cisternas-Estay's testimony before the immigration judge, Adm.Rec., pp. 33–34, and the Service's show cause orders, Adm.Rec., pp. 55–58. As to the fall of the Allende government, we rely upon Adm.Rec., p. 70 and Respon. Br., p. 3.

4. Nowhere in the record do we find a delineation of the precise factors taken into account by the district director. *See* note 3 *supra.* The letter received by the district director appears at page 70 of the Administrative Record. The Service admits he did take it into account. Respon. Br., p. 3.

proclamation forbidding crimes against the "essential interests" of Chile by nationals living abroad. At the hearing Cisternas-Estay introduced secondary material in support of his general claim that the current government in Chile is repressive. There is no evidence as to any manifestation of hostility by this government toward the Cisternas-Estays.

After the hearing, but three months before the filing of the judge's opinion, 8 CFR § 242.8 was amended by the Attorney General, giving the "special inquiry officer," the immigration judge,[5] the authority "to consider claims for relief from deportation under Articles 32 and 33 of the Convention Relating to the Status of Refugees, as amended by the Protocol Relating to the Status of Refugees. . . ."[6] No mention of the articles was made in the immigration judge's opinion, nor in the decision of the Board dismissing appeal. The immigration judge made reference to the letter from the Department of State, which did not treat the articles. The counsel for the Cisternas-Estays did not raise this defense in argument before the Board. Administrative Record, pp. 9–16.

■ On February 18, 1975 the Board dismissed the appeal from the immigration judge's denial of the request for withholding of deportation. Sitting on the Board was David Milhollan, Esq., and Irving Appleman, Esq., who at the time of argument before the Board, were attorneys in the office of the Service's general counsel. Mr. Appleman disqualified himself.[7] Mr. Milhollan helped decide the instant case. There is no showing that he had anything to do with the case when he was with the Service; his affidavit to that effect is attached to the government's brief. Further, he indicates that he did not discuss the case with other members of the Board.

Cisternas-Estay has filed a timely petition for review with this court. We have jurisdiction under section 106 of the INA, 8 U.S.C. § 1105a.

### I.

Reaching the APA issue first, we hold that *Giambanco v. Immigration and Naturalization Service*, 531 F.2d 141 (3d Cir.), controls. There we held that the APA did not apply to Board section 245, 8 U.S.C. § 1255, and section 212(h), 8 U.S.C.

---

5. *See Marcello v. Bonds*, 349 U.S. 302, 305, 75 S.Ct. 757, 99 L.Ed. 1107 (1955).

6. The relevant portions of the articles are as follows:

"Article 32 [Expulsion]
1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order.
2. The expulsion of such a refugee shall be only in pursuance of a decision reached in accordance with due process of law. Except where compelling reasons of national security otherwise require, *the refugee shall be allowed to submit evidence to clear himself,* and to appeal to and be represented for the purpose before competent authority or a person or persons specially designated by the competent authority." (emphasis supplied)

"Article 33 [Prohibition of Expulsion or Return ("Refoulement")]:
1. No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.

7. At oral argument before this court it was noted that only three members of the five-member Board heard oral argument. Adm. Rec., p. 9. In effect a panel was created. At that time the relevant portions of the regulation relating to the organization of the Board, 8 CFR § 3.1, read:

"§ 3.1 Board of Immigration Appeals
(a) *Organization.* . . . The Board shall consist of a chairman and four other members and shall have attached to it an executive assistant-chief examiner who shall have authority to act as an alternate member.

(d) *Powers of the Board.* (1) *Generally.* Subject to any specific limitation prescribed by this chapter, in considering and determining cases before it as provided in this part the Board shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case.

(3) *Rules of practice; discipline of attorneys and representatives.*
The Board shall have authority, with the approval of the Attorney General, to prescribe rules governing proceedings before it . . ."

§ 1182(h), proceedings, involving adjustment of status and waiver of a ground of excludability. The only factor distinguishing the *Giambanco* case from that of Cisternas-Estay is that Cisternas-Estays' action is under section 243(h) [8] and seeks suspension of deportation. However this distinction should not affect the application of the APA.

In *Giambanco,* we relied upon *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), to find that review by the Board of section 245 and 212(h) orders affecting section 242 deportation was an integral part of the section 242 specialized hearing procedures found in *Marcello* not to be subject to the APA.

■■■ All the provisions of the INA relied upon by both Giambanco and Cisternas-Estay, sections 212, 243 and 245 relate to an adjustment of a section 242 determination. The section 242 keystone was drafted with a specialized procedure different from that of the APA, as *Marcello* tells us. When the Board sits in review of determinations under other INA sections ultimately relating to the correctness of section 242 deportation, it functions as an integral part of these specialized procedures. The Board is the oversight mechanism used by the Attorney General in fulfilling his duty to assure that the hearing requirements of the section are met. We refrain from promulgating a rule that, where an immigration judge, or special inquiry officer, is not accountable to the APA during a section 242 proceeding, the Board is subject to the APA when it sits in review of a section 245 order adjusting the section 242 determination. We find the APA not controlling in this adjustment of status context.

## II.

The second issue in this controversy is whether the Board's weighing of the equities under section 243(h) constitutes an abuse of discretion.

■■ On these facts we cannot say that the Attorney General has abused his discretion. The government is quite right in pointing out that the Cisternas-Estays have shown no animus of the current government of Chile toward them. The record shows only some secondary materials on repression in Chile, a very brief and vague statement by Mr. Cisternas-Estay attacking the current government, perhaps prepared *post litem motam,* and a vague proclamation from the current junta referring to crimes against Chile's "essential" interests, which could lead to loss of citizenship. There is nothing in the record to undermine the Board's position that the press conference was "staged" to acquire section 243(h) relief. In these circumstances it has not been shown that there is a "clear probability" that the Cisternas-Estays will be subject to persecution if deported to Chile. *Rosa v. Immigration and Naturalization Service,* 440 F.2d 100, 102 (1st Cir. 1971); *Lena v. Immigration and Naturalization Service,* 379 F.2d 536, 538 (7th Cir. 1967). *See also, Rassano v. Immigration Service,* 492 F.2d 220, 227 (7th Cir. 1974) ("reasonable foundation" alternative test); *Khalil v. Immigration and Naturalization Service,* 457 F.2d 1276, 1277–78 (9th Cir. 1972); *Biggin v. Immigration and Naturalization Serv.,* 479 F.2d 569, 572 (3d Cir. 1973) (The general test for review of immigration decisions is whether the Service's determination was "arbitrary, capricious, or illegal.").

---

The language in (d) is enough to allow division into panels. This authority was subsequently specifically accorded in a § 3.1 amendment, 40 Fed.Reg. 37207 (August 26, 1975), which authorized a Board quorum of three members.

**8.** Section 243(h) allows the Attorney General, at his discretion, to "withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason." 8 U.S.C. § 1253(h).

■ Nor was the use by the Service of the letter from the Department of State an abuse of discretion, as contended by Cisternas-Estay's counsel. The Cisternas-Estays argue that the letter is completely irrelevant to their fears of persecution under the present government of Chile, since the letter concerned the Allende government. However, it is perfectly reasonable for the Service to assess the validity of the asylum request under both governments, since the request has hinged at one time or other on the aliens' opposition to both. Thus, the Service has quite properly exercised its authority under 8 C.F.R. § 242.17 by determining that the letter was relevant. Finally, we note that the Cisternas-Estays' counsel has failed to enlighten us with any precedent supporting this contention. We reject it.

### III.

■ The arguments by the Cisternas-Estays on the last two questions, the Protocol and de facto asylum matters, suffer from the defect that they are raised for the first time on appeal. Thus the court does not have the benefit of a final order on these matters either from the immigration judge or from the Board. This court does not sit as an administrative agency and, if counsel wishes to preserve an issue on appeal, he must raise it in the proper administrative forum. *Compare Chung Young Chew v. Boyd,* 309 F.2d 857, 861 (9th Cir. 1962) (under 8 U.S.C. § 1105a); *Chi Sheng Liu v. Holton,* 297 F.2d 740, 744 (9th Cir. 1962) *with Pilapil v. Immigration and Naturalization Service,* 424 F.2d 6, 9 (10th Cir. 1970), *cert. denied,* 400 U.S. 908, 91 S.Ct. 152, 27 L.Ed.2d 147 (1970) (constitutional issue).

■ As to the applicability of articles 32 and 33 of the Protocol, counsel for the

Cisternas-Estays had the opportunity to raise the issue before the Board after the regulation was promulgated and failed to do so. This is a substantial defect because it deprives us of the Service's wisdom on whether the test under section 243(h) is substantially different from that under the language of the articles. *See Kan Kam Lin v. Rinaldi,* 361 F.Supp. 177, 184 (D.N.J. 1973), *aff'd,* 493 F.2d 1229 (3d Cir. 1974) (per curiam by Judges Aldisert, Gibbons, and Rosenn), *cert. denied,* 419 U.S. 874, 95 S.Ct. 136, 42 L.Ed.2d 113 (1974). The amended Service regulation 8 C.F.R. § 242.8 merely authorizes the Service to consider Protocol defenses to deportation. This language places the burden on the Cisternas-Estays' counsel to raise the Protocol defense to deportation.[9] *Cf. Kan Kam Lin,* 361 F.Supp. at 184.

We find none of the objections to the Service's determinations meritorious and therefore will affirm the Board's decision.

GIBBONS, Circuit Judge (dissenting).

Although the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (hereinafter APA), has been in effect since 1946, and the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (hereinafter INA), since 1952, new issues occasionally arise concerning their interrelationship. The two cases *sub judice* squarely confront this court with an issue of first impression: does the mandatory disqualification provision of § 5(c) of the APA, 5 U.S.C. § 554(d),[1] govern the review by the Board of Immigration Appeals (hereinafter BIA) of decisions of an immigration judge, specifically those denying adjustment of status, a request for a waiver of a ground of excludability and a petition for suspension of deportation under §§ 245,

---

**9.** In addition the Protocol, itself, places the burden of showing its applicability on the refugee. *See* emphasized portion of article 32 note 6 *supra.*

**1.** An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or *agency review* pursuant to section

557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency. (emphasis added).

212(h) and 243(h) respectively of the INA, 8 U.S.C. §§ 1255, 1182(h), 1253(h)?[2] If the APA applies, we must reverse because the affidavits submitted by the Board members[3] who were employed as counsel for the Immigration and Naturalization Service (hereinafter INS) at the date of oral argument do not, as § 5(c) requires, deny participation or advice in a "factually related case."[4] If it does not, we should, as the majority holds, affirm the Board's decision on the ground that procedural due process was not violated by the mere combination of such agency functions as prosecution and adjudication in the same Board members. *See, e. g., Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); *Marcello v. Bonds,* 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955); *Shaughnes-*

*sy v. United States ex rel. Accardi,* 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955).

I conclude that § 5(c) of the APA governs these proceedings before the BIA. In my view the majority opinion ignores the Supreme Court's reasoning in *Marcello v. Bonds* in extending the exemption of deportation hearings from coverage by the APA to administrative review of those hearings by the BIA. By so holding the majority ignores as well an express congressional pronouncement and sound policy reasons in favor of APA coverage.

## I

In order to determine whether or not the procedural requirements of the APA govern BIA proceedings, a brief review of the in-

---

**2.** It is clear that the decision of the BIA is a "final disposition" within the meaning of "order" and "adjudication" as defined by 5 U.S.C. §§ 551(6), (7). *See Foti v. Immigration & Nat. Serv.,* 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963). Thus the cases *sub judice* are easily distinguishable from *ITT v. Electrical Workers,* 419 U.S. 428 (1975), where the Supreme Court held that § 5(c) of the APA did not govern proceedings conducted under § 10(k) of the National Labor Relations Act, 29 U.S.C. § 160(k).

**3.** In *Giambanco v. INS,* Chairman Milhollan and Member Appleman swore that they did not participate in any way in the case against petitioner, that they had no knowledge of the case prior to becoming members of the Board, and that they were not influenced by the fact that they knew the attorney arguing the case. (Exhibits A and B in the Addendum of Respondent's Brief).

In *Cisternas-Estay v. INS,* however, the affidavits indicate, contrary to petitioner's argument, that member Appleman who had argued the case before the Board, disqualified himself and, therefore, did not, participate in the decision. Chairman Milhollan made the same representations as he had in his affidavit in Giambanco. Therefore, this case must also be remanded to the Board in order to ascertain whether or not Milhollan had been involved in a "factually related case."

In both cases, I do not think that the fact that the members in question swear that they "had no knowledge of the case" prior to their elevation to the Board is sufficiently clear to warrant a conclusion that there was no involvement in a "factually related case." The Government wants to leave the issue of disqualification to

the discretion of the member himself. Certainly a member of the Board may disqualify himself pursuant to § 7(a) of the APA, 5 U.S.C. § 556(b). At issue in this case, I think, is the question of mandatory disqualification under § 5(c), not voluntary disqualification under § 7(a).

**4.** The term "factually related case" is nowhere defined in the statute. A generic meaning might include a case involving the same subject area, such as deportation, exclusion, adjustment of status, etc. I do not think this interpretation was intended by the draftsmen since its vast potential for disqualification would cripple the administration of the law. Moreover, the legislative history and statutory language of the APA, as was emphasized in *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), do not envision a total separation of functions. *See generally* U.S. Senate Committee on the Judiciary, *Administrative Procedure Act: Legislative History* 24–25, 237, 263, 361–62 (1946). A more precise, and I think intended, meaning for this factual relationship would include cases deriving from "a common nucleus of operative facts," the same test used in the area of pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Some support for this definition can be found in *American Cyanamid Co. v. Federal Trade Commission,* 363 F.2d 757, 768 (6th Cir. 1966). *See generally Federal Trade Commission v. Cement Institute,* 333 U.S. 638, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); Note, Prejudice and the Administrative Process, 59 Nw.U.L.Rev. 216, 231 (1964).

terrelationship between that statute and the INA is in order. Until 1950 it was generally thought, and with good reason, that deportation hearings were exempt from APA coverage. Section 7(a) of the APA, 5 U.S.C. § 556(b), provides in part that:

This subchapter does not supersede the conduct of specified classes of proceedings, in whole or in part, by or before boards or other employees specially provided for by or designated under statute. . . .[5]

Immigration inspectors who presided over deportation hearings were "specially provided for or designated pursuant to" § 16 of the Immigration Act. Act of February 5, 1917, 39 Stat. 885. Moreover, § 5 of the APA applied only to cases of "adjudication required by statute" and there was no express requirement for any hearing or adjudication in the provision of the Immigration Act of 1917 authorizing deportation.[6] Act of February 5, 1917, 39 Stat. 887. *See, e. g., United States ex rel. Saclarides v. Shaughnessy,* 180 F.2d 687 (2d Cir. 1950); *Azzollini v. Watkins,* 172 F.2d 897 (2d Cir. 1949). *Contra, United States ex rel. Trinler v. Carusi,* 166 F.2d 457 (3d Cir.), *rev'd on other grounds,* 168 F.2d 1014 (3d Cir. 1948).

In *Wong Yang Sung v. McGrath,* 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), however, the Supreme Court held that the APA governed deportation hearings because, while not statutorily mandated, they were constitutionally required. 339 U.S. at 50, 70 S.Ct. 445. Justice Jackson, writing for the majority of the Court, announced that "it is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act [the APA] to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns." 339 U.S. at 45, 70 S.Ct. at 452. Applying this

broad policy to the issue of deportation hearings, he continued:

The Administrative Procedure Act did not go so far as to require a complete separation of investigating and prosecuting functions from adjudicating functions. But that the safeguards it did set up were intended to ameliorate the evils from the commingling of functions as exemplified here is beyond doubt. And this commingling, if objectionable anywhere, would seem to be particularly so in the deportation proceeding, where we frequently meet with a voteless class of litigants who not only lack the influence of citizens, but who are strangers to the laws and customs in which they find themselves involved and who often do not even understand the tongue in which they are accused. Nothing in the nature of the parties or proceedings suggests that we should strain to exempt deportation proceedings from reforms in administrative procedure applicable generally to federal agencies. 339 U.S. at 46, 70 S.Ct. at 452.

Despite its potential for wider application in immigration proceedings, the *Wong Yang Sung* decision was strictly interpreted by lower federal courts to govern only deportation and not exclusion hearings. *See, e. g., United States ex rel. Frisch v. Miller,* 181 F.2d 360 (5th Cir. 1950). Congress, moreover, in a rider to the Supplementary Appropriations Act of 1951, 64 Stat. 1048, negated the effect of *Wong Yang Sung* by specifically exempting deportation and exclusion hearings from the provisions of Sections 5, 7 and 8 of the APA.[7] Thus, until passage of the INA in 1952 it was clear that the procedural requirements of the APA did not govern deportation and exclusion hearings. Whether or not the APA would apply to other immigration proceedings, however, was never determined.

---

5. Until its amendment during recodification in 1966, § 7(a) of the APA, 5 U.S.C. § 1006(a), read:

Nothing in this Act shall be deemed to supersede the conduct of specified classes of proceedings in whole or part by or before boards or other officers specially provided for by or designated pursuant to statute.

6. There is also no specific exemption for the INS in § 2(a)(1) of the APA, 5 U.S.C. § 551(1).

7. This provision was later codified in 8 U.S.C. § 155a.

While the INA explicitly repealed the Appropriations Act rider, 8 U.S.C. § 155a, it did not specifically incorporate the holding of *Wong Yang Sung* with respect to deportation hearings. Instead, Congress consciously adopted a special administrative procedure which mirrored in part analogous provisions of the APA. *See* H.Rep.No.1365, 82d Cong. 2d Sess. (1952), 2 U.S.Code Cong. & Admin.News, p. 1710. The Supreme Court in *Marcello v. Bonds, supra,* 349 U.S. at 306–10, 75 S.Ct. 757, compared §§ 242(b) and 101(b)(4) of the INA, 8 U.S.C. §§ 1252(b) and 1101(b)(4), with §§ 5, 6 and 7 of the APA, 5 U.S.C. §§ 554, 555 and 556, and concluded that Congress had modified and adapted the APA hearings provisions to the particular needs of the deportation process.[8] The Court held that the INA hearings provisions expressly superseded those of the APA despite a pointed dissent by Justice Black who, joined by Justice Frankfurter, thought the more demanding features of the APA should govern. 349 U.S. 315–19, 75 S.Ct. 757 (Black, J., dissenting).

But the Court in *Marcello v. Bonds* did not discuss the relationship between the APA and other immigration proceedings besides deportation hearings. What the Court did establish in that decision, however was a method of analysis to employ in discovering the interrelationship between the two acts. A court must compare the INA with analogous provisions of the APA to determine if Congress meant to adapt the procedural safeguards of the APA to

the particular needs of the INS. In cases of doubt the court should refer to the legislative history of both acts for guidance. But the fundamental presumption underlying this analysis is that where Congress has not specifically deviated from the APA by either adaptations of its provisions within the INA itself or statements in the legislative history, the APA should govern. 349 U.S. at 310, 75 S.Ct. 757. This presumption is consistent with the language and policy of § 12 of the APA, 5 U.S.C. § 559, which states in relevant part that a subsequent statute like the INA "may not be held to supersede or modify this subchapter [which includes § 5(c)] . . . except to the extent it does so expressly." *See, e. g., Rusk v. Cort,* 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962); *Marcello v. Bonds, supra* at 310, 75 S.Ct. 757; *Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

## II

Careful scrutiny of the provisions of the INA discloses that the BIA is not mentioned anywhere in the 119 page Act. Despite vigorous attempts to provide for the creation by statute of the BIA, the INA left it to be established and governed only by regulations of the Attorney General pursuant to his authority under § 103(a), 8 U.S.C. § 1103(a). The Attorney General has established a Board composed of a chairman and four other members and has outlined its broad appellate jurisdiction. 8 C.F.R. § 3.1(a). It is clear from the scope[9] and

---

**8.** Section 242(b) of the INA, 8 U.S.C. § 1252(b), provides a more restrictive mandatory disqualification provision than its counterpart under § 5(c) of the APA. It provides in pertinent part that:

No special inquiry officer shall conduct a proceeding in any case under this section in which he shall have participated in investigative functions or in which he shall have participated (except as provided in this subsection) in prosecuting functions.

**9.** (b) *Appellate jurisdiction.* Appeals shall lie to the Board of Immigration Appeals from the following:

(1) Decisions of special inquiry officers in exclusion cases, as provided in Part 236 of this chapter.

(2) Decisions of special inquiry officers in deportation cases, as provided in Part 242 of this chapter, except that no appeal shall lie from an order of a special inquiry officer under § 244.1 of this chapter granting voluntary departure within a period of at least 30 days, if the sole ground of appeal is that a greater period of departure time should have been fixed.

(3) Decisions on applications for the exercise of the discretionary authority contained in section 212(c) of the act, as provided in Part 212 of this chapter.

(4) Decisions involving administrative fines and penalties, including mitigation thereof, as provided in Part 280 of this chapter.

operation of the Board's appellate jurisdiction that an appeal must be considered as a distinct proceeding in need of some procedural safeguards. The Board, for example, does not consider itself bound by the findings made by an immigration judge. A former chairman of the Board has stated that:

Unlike appellate courts, on questions of fact the Board is not limited to a determination if there was substantial evidence upon which the finding of the Special Inquiry Officer was based. The Board has the power and authority to review the record and makes its own conclusions as to facts. . . . In a word, the Board may make a de novo review of the record and makes its considerations and findings irrespective of those made by the Special Inquiry Officer.

Finucane, Procedure Before the Board of Immigration Appeals, 31 Int.Rel. 26 (Jan. 22, 1954).

See, e. g., Noverola-Bolaina v. Immigration & Nat. Serv., 395 F.2d 131, 135–36 (9th Cir. 1968); Matter of B____, 7 I. & N.Dec. 1, 36 (1956). But the regulations governing the BIA contain no mandatory disqualification provision similar to § 5(c) of the APA or § 242(b) of the INA. Thus, if the majority position is adopted, the alien has no greater procedural protection at Board proceedings than the requirements of the due process clause even though he does have the safeguards afforded by § 242(b) of the INA during proceedings conducted by immigration judges. This anomaly is never discussed by the majority but is probably attributable to their assumption that greater procedural protections are afforded at hearings conducted by immigration judges only because Congress expressly granted them in § 242(b).

This assumption, however, conflicts with the reasoning of Marcello v. Bonds and the legislative history of the INA. The House adopted a proposal to give the BIA statutory status but this provision was eliminated in conference. See 98 Cong.Rec. 4401; H.R. Rep.No.1365, 82d Cong., 2d Sess. 36 (1952); S.Rep.No.1137, 82d Cong., 2d Sess. pt. 2 at 8. (Minority Rep. on S. 2550) (1952), U.S. Code Cong. & Admin.News 1952, p. 1710. The reason for the rejection of a statutory BIA, according to Congressional testimony, was to prevent an independent board set up within the Department of Justice from possessing the authority to set aside the decisions of the head of that department, the Attorney General. See 98 Cong.Rec. 5778–5781 (1952). Thus, Congress made an accommodation with the portion of § 5(c) of the APA which prohibits an agency employee engaged in adjudication from being "responsible to or subject to the supervision or direction of an[y] officer, employee or agent engaged in the performance of investigation or prosecuting functions for an agency." But this decision cannot be interpreted to mean that Congress intended that all proceedings before the Board be exempt from the APA. Indeed, the evidence suggests a contrary view.

Senator McCarran, the senatorial sponsor of both the APA and the INA as well as the

(5) Decisions on petitions filed in accordance with section 204 of the act (except petitions to accord preference classifications under section 203(a)(3) or section 203(a)(6) of the act, or a petition on behalf of a child described in section 101(b)(1)(F) of the act), and decisions on requests for revalidation and decisions revoking the approval of such petitions, in accordance with section 205 of the act, as provided in Parts 204 and 205, respectively, of this chapter.

(6) Decisions on applications for the exercise of the discretionary authority contained in section 212(d)(3) of the act as provided in Part 212 of this chapter.

(7) Determinations relating to bond, parole, or detention of an alien as provided in Part 242 of this chapter.

(8) Decisions of special inquiry officers in rescission of adjustment of status cases, as provided in Part 246 of this chapter.

(c) *Jurisdiction by certification.* The Commissioner, or any other duly authorized officer of the Service, or the Board may in any case arising under paragraph (b) of this section require certification of such case to the Board.

leader of the opposition to the statutory creation of the BIA, concluded that:

> Except in cases of proceedings under section 235(c), relating to security cases, *the provisions of the Administrative Procedure Act are made applicable to all proceedings before the Board of Immigration Appeals,* thereby providing judicial review in exclusion cases. 98 Cong.Rec. 5778 (1952) (remarks of Senator McCarran) (emphasis added).

Senator McCarran's interpretation is supported by the language of the proposals for a statutory BIA themselves, which did not provide for any special procedural safeguards. *See* 98 Cong.Rec. 4401 (remarks of Representative Celler), 5778 (remarks of Senator Moody). Presumably no procedural safeguards were included in these statutory proposals because even these congressmen believed that the APA would govern review proceedings.

Thus, applying the same reasoning and analysis which Justice Clark employed in *Marcello v. Bonds,* I conclude that § 5(c) governs these review proceedings. The majority opinion rejects this conclusion for two reasons. First, the majority urges that leaving the initial hearing examiner exempt from the APA while requiring the Board to comply would be an anomalous result. There is no such anomaly, because Congress in the INA dealt specifically with the procedural safeguards applicable to the initial hearing, but did not deal with the nonstatutory Board of Appeals. Next, the majority argues that the language of § 242(b) of the INA expressly stating that the procedure outlined for determining deportability "shall be the sole and exclusive procedure" should also apply to the Board. This argument, however, ignores the fact that no procedural safeguards have been outlined in the statute for the conduct of Board proceedings and the additional fact that the Board has been given a wider scope of jurisdiction than just review of deportation decisions. Moreover, as Justice Clark argued in *Marcello v. Bonds,* this provision of

§ 242(b) refers to Congress' intent to exempt initial deportation hearings from APA coverage. It does not address the question of what procedures should govern the review of those proceedings which the Attorney General has directed the BIA to provide.

### III

The most important reasons for applying § 5(c) of the APA to these cases, of course, are not these basic rules of statutory interpretation but rather the policy and purpose of the APA which Justice Jackson first announced in the context of immigration proceedings in *Wong Yang Sung.* While the impact of the *Wong Yang Sung* holding upon deportation hearings has been substantially altered by later cases and the passage of the INA, its broad policy analysis is still applicable to other immigration proceedings.

Certainly the commingling of the functions of advocacy and adjudication at stake in these cases was one of the undesirable features of the administrative process which the APA was designed to remedy. *See* Rep. Atty. Gen. Comm. Ad. Proc. 56 (1941), S.Doc.No.8, 77th Cong., 1st Sess. 56 (1941). Given Justice Jackson's direction to the courts "to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns",[10] we should not hesitate to extend the procedural safeguards of the APA to cases before the Board of Immigration Appeals. Moreover, just as Justice Jackson concluded in the case of deportation hearings, "nothing in the nature of the parties or proceedings suggests that we should strain to exempt . . . [these] proceedings from reforms in administrative procedure applicable generally to federal agencies." 339 U.S. at 46, 70 S.Ct. at 452. Finally, since Board appeals are often intimately connected with a prior deportation hearing, the absence of procedural safeguards afforded to a petitioner at this stage of the deportation process is as "particularly" objectionable as the

---

10. *Wong Yang Sung v. McGrath,* supra, 339 U.S. at 45, 70 S.Ct. at 452.

absence of such safeguards at the hearing itself. We are just as likely to meet a "voteless class of litigants who not only lack the influence of citizens, but who are strangers to the laws and customs in which they find themselves involved and who often do not even understand the tongue in which they are accused"[11] at the appellate stage, because of the broad right of review granted by the Attorney General's regulations, as we are at the initial hearing.

Even if the legislative history did not lead me to the conclusion that the mandatory disqualification provision of § 5(c) of the APA applies, these policy considerations would. The APA is precisely the type of remedial statute which provides courts with a broad congressional judgment regarding administrative policy to which they should refer in establishing rules of decision in this area, especially in cases of first impression. Even if not literally applicable, the statute is a significant precedent. Those familiar with the history of the interrelationship of the APA and INA will recognize immediately that there has been a continuous dialogue between the courts and Congress on such issues as now confront this court. *See, e. g.,* Note, Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts, 71 Yale L.J. 760 (1962). With this in mind I believe we should hold that the APA applies and expect Congress to overrule us if we have misinterpreted its original intention or erroneously anticipated its later judgment.

In summary, § 5(c) of the APA governs these appeals and requires us to remand it to the Board to determine if the members in question had participated or advised in a "factually related case." I am not at all concerned, as the majority appears to be, that "[t]o apply the APA in these cases would interject needless complexity into what is designed to be a discretionary process." Complexities are the very sinews of liberty, and simplification, in the sanctioning context, almost invariably the weapon of oppressors.