**Chim MING, Plaintiff,**

v.

**Sol MARKS, as District Director of the Immigration and Naturalization Service for the District of New York, and William P. Rogers, as Secretary of State of the United States of America, Defendants.**

**LAM YIM YIM et al., Plaintiffs,**

v.

**Sol MARKS, as District Director of the Immigration and Naturalization Service for the District of New York, Defendant.**

Nos. 73 Civ. 545, 73 Civ. 1342.

United States District Court,
S. D. New York.

Nov. 27, 1973.

Lebenkoff & Coven, New York City, for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty., U. S. District Court, Southern District of N. Y., for defendants.

## MEMORANDUM OPINION

ROBERT L. CARTER, District Judge.

The plaintiffs in these two cases have petitioned the court for a preliminary injunction staying deportation orders now pending against them and the Government has cross-moved for summary judgment. The plaintiffs,[1] Chinese aliens arriving in this country as seamen on ships out of Hong Kong, seek asylum here as refugees under the provisions of the United Nations Protocol Relating to the Status of Refugees (hereinafter "the Protocol"), 19 U.S.T. 6223, T.I.A.S. No. 6577, and the 1951 Geneva Convention Relating to the Status of Refugees (hereinafter "the Convention"), 19 U.S.T. 6259, T.I.A.S. No. 6577.

The jurisdiction of this court is invoked pursuant to 5 U.S.C. §§ 702–706, 8 U.S.C. § 1329 and 28 U.S.C. § 2201 et seq. The Government does not contest jurisdiction. In an action similar to this, Kan Kam Lin v. Rinaldi, 361 F.

---

1. In addition to the two actions now before this court, 130 other separate, but similar, actions have been filed seeking a stay of deportation. Counsel for all the plaintiffs and the Government have agreed to submit only two actions, chosen as factually and legally representative of the claims of all plaintiffs, for decision. Counsel have further stipulated to be bound in each of these other actions by the court's decision in these two cases. A complete list of the other actions involved is attached as an appendix.

Supp. 177 (D.N.J.1973), jurisdiction was found to exist pursuant to 8 U.S.C. § 1329. I follow the holding in that case on this point and find that jurisdiction is properly asserted. And see Buckley v. Gibney, 332 F.Supp. 790 (S.D.N.Y.), aff'd, 449 F.2d 1305 (2d Cir. 1971), cert. denied, 405 U.S. 919, 92 S.Ct. 946, 30 L. Ed.2d 789 (1972).

## I

### Factual Background [2]

*Chim Ming:*

Chim Ming was born in China in 1919 and maintained continuous residence there until 1955. He then migrated to Hong Kong, was issued appropriate papers, became a seaman and was so employed from 1955 to 1967. Plaintiff's wife and three of his children remain in China and a fourth child lives in Hong Kong. In April 1967, after deserting his ship in Newark, New Jersey, he was permitted to enter this country as a non-immigrant crewman authorized to remain for a period of twenty-nine days. Section 252 of the Immigration and Nationality Act (hereinafter "the Act"), 8 U.S.C. § 1282.

The plaintiff did not depart this country at the end of the authorized 29-day stay. He was apprehended on January 26, 1968, and deportation proceedings were begun. At the hearing plaintiff conceded deportability and by order of the Special Inquiring Officer, dated February 9, 1968, he was ordered deported. After being released on bond Chim Ming failed to surrender for deportation and was not again apprehended until 1972. Provisions were made for his deportation on December 1, 1972, but on November 24, 1972, plaintiff submitted a request for political asylum. A hearing on this application was held and pursuant to then current procedures, the Department of State was asked for an advisory opinion. The Department concluded that since plaintiff had not demonstrated that he was a political refugee, his deportation was appropriate.

The plaintiff was notified on January 16, 1973, that his request for asylum had been denied but that he could request a temporary stay of deportation pursuant to § 243(h) of the Act, 8 U.S.C. § 1253(h), if he could establish that he would be subject to persecution in Hong Kong. Plaintiff concedes he is not entitled to relief under this section and has instituted this action to prevent deportation under the provisions of the Protocol and the Convention. The court has issued a temporary restraining order with the Government's consent, enjoining deportation until these issues are resolved.

*Lam Yim Yim:*

Lam Yim Yim was born in China in 1933 and lived there until 1961 when he entered Hong Kong. His wife, parents and five children remain in China. The plaintiff was permitted to enter this country as a non-immigrant crewman while his ship was in port for a period not to exceed 29 days. Section 252 of the Act, 8 U.S.C. § 1282. The plaintiff, after entry, deserted his ship and remained in this country beyond the authorized period.

Lam Yim Yim was apprehended on September 21, 1972 in New York City and deportation proceedings were begun, culminating in a hearing on October 3, 1972 at which plaintiff conceded deportability. The Special Inquiring Officer found him deportable and granted his request of voluntary departure no later than November 15, 1972. The plaintiff did not leave this country as required and on March 16, 1973 a warrant of deportation was issued against him.

On March 27, 1973 Lam Yim Yim submitted a request for political asylum and a hearing was held on that application on April 2, 1973. Unlike the case of Chim Ming, the Immigration and Naturalization Service, without consultation

2. The statement of facts, which is drawn from the Government's affidavit in opposition to a motion for a preliminary injunc- tion, has been conceded by plaintiff's attorneys to be accurate.

with the Department of State, concluded that the plaintiff was not a political refugee.[3] On April 9, 1973 Lam Yim Yim was notified of this decision and advised of his right to seek further relief pursuant to Section 243(h) of the Act, 8 U.S.C. § 1253(h), as a person subject to persecution in Hong Kong. Plaintiff, conceding the inapplicability of that statute to his case, initiated this action seeking relief pursuant to the Protocol and the Convention. The court has temporarily restrained deportation, with the Government's consent, pending determination of the issues raised here.

## II

### *The Protocol and The Convention*

On October 4, 1968, the United States Senate approved, effective November 1, 1968, the United Nations Protocol Relating to the Status of Refugees. 19 U.S. T. 6257. The Protocol provides in Article 1 that except for certain technical alterations:

> "1. The States Parties to the present Protocol undertake to apply articles 2 to 34 inclusive of the Convention [relating to the Status of Refugees] to refugees as hereinafter defined."

The Convention (as modified by the Protocol) defines a "refugee", in Article 1, A(2), as any person who

> "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country; or who, not having a nationality and being outside the country of his former habitual residence as a result of such events, is unable or, owing to such fear, is unwilling to return to it."

Article 32 of the Convention, made applicable to the United States through the Protocol, provides in pertinent part:

### *Expulsion*

> "1. The Contracting States shall not expel a refugee lawfully in their territory save on grounds of national security or public order."

The parties have narrowed the issues to 1) whether the plaintiffs are in fact refugees within the meaning of the Convention and 2) whether, if they are refugees, they are entitled to protection under Article 32 of the Convention. For the purposes of this opinion it will be assumed that plaintiffs are refugees. On that assumption, we proceed to a determination of the second question.

By its own records, Article 32 prohibits the contracting States from expelling refugees "lawfully in their territory" except for national security reasons. No national security issues have been raised by the Government, and we are required only to define the phrase "lawfully in their territory".

The plaintiffs ask the court to disregard the accepted and common definitional usage of the term "lawfully". They argue that unless this approach is adopted the treaty would be "a nullity" since most refugees are, because of their desperate situations, in the country illegally. The plaintiffs offer no historical or legislative support, or legal precedent for their position.

The Government, on the other hand, argues that the word "lawfully" is critical to a proper interpretation of Article 32 and that its meaning is clear and unequivocal; and thus that in the context of this lawsuit, the court must look to the immigration laws of this country to determine the lawfulness of an alien's presence. The Government's position is supported by the treaty's history, its

---

3. This change in procedure, effectuated between the time of Chim Ming's refugee hearing and Lam Yim Yim's hearing, is concededly the only significant distinction between these two cases. The plaintiffs each raise the identical claims under the Protocol and the Convention, but in addition, Lam Yim Yim attacks the propriety of these revised procedures. This distinct aspect of his case will be discussed separately after joint issues are disposed of.

legislative history in the Senate, court rulings, and the clear meaning of the words in question.

*The Treaty:*

The United Nations Ad Hoc Committee on Statelessness and Related Problems which drafted Article 32 has stated:

> "The expression 'lawfully within their territory' throughout this draft Convention would exclude a refugee who while lawfully admitted has overstayed the period for which he was admitted or was authorized to stay or who has violated any other condition attached to his admission." Report, U.N.E.C.O.S.O.C. at 47, U.N. Doc. E/1618/Corr. 1/E/AC.32/5/Corr. 1 (March 2, 1950).

The Committee later elaborated on its thinking:

> "The Committee decided that it was not always necessary to insert in the text definitions of expressions used. However, since some question was raised as to the phrase 'lawfully in the territory', the Committee expressed the view that, in any event, a Contracting State may consider that a refugee is no longer lawfully in its territory if he is in contravention of terms imposed as a condition of his admission or sojourn." Report, U.N.E.C.O.S.O.C. at 11, U.N. Doc. E/1850/E/AC.32/8 (August 25, 1950).

Furthermore, in a letter to counsel in a similar action, the Deputy Representative of the United Nations High Commissioner for Refugees, quoting directly from instructions received from his Geneva headquarters, states, in part:

> "In determining whether a refugee is 'lawfully in the territory' of a Contracting State, regard must be had to all the circumstances of his presence there, and in this respect the manner in which he originally entered the territory, i. e. lawfully or unlawfully, is not the only decisive factor.
>
> "Art. 31 of the 1951 Convention recognizes the possibility that the status of a refugee who has entered illegally the territory of a Contracting State may subsequently be regularized. Conversely, the stay of a refugee who has entered in a regular manner, may subsequently become unlawful. This would for example be the case if the authorities of the country are not prepared to grant him residence beyond the *limited period* for which he was admitted or if they withdraw his residence permission on the ground that he has not complied with the *conditions* under which he was admitted, e. g. to pursue his studies. As long as his stay is 'lawful,' even though admitted temporarily, he can only be expelled on grounds of 'national security and public order.' If, however, his stay ceases to be 'lawful' in the circumstances described above, he is no longer 'lawfully in the territory of the Contracting State' and may therefore not invoke the special protection of Art. 32 of the 1951 Convention." Affidavit of Joseph Marro in Opposition to a Motion for a Preliminary Injunction, sworn to on April 19, 1973 at Exhibit A. (Emphasis in original.)

*History of United States Action on the Protocol:*

The history of the adoption of the Protocol by this country makes clear that all the individuals and institutions involved in that process had a continuing belief that the Convention would not alter or enlarge the effect of existing immigration laws, chiefly because it was felt that our immigration laws already embodied the principles of the Convention. Thus, in transmitting the Protocol to the President, the Secretary of State noted that "United States accession to the Protocol would not impinge adversely upon the laws of this country." S. Exec.K. 90th Cong., 2d Sess. at VII. President Johnson, in forwarding the Protocol to the Senate for approval, stated:

> "It is decidedly in the interest of the United States to promote this

United Nations effort to broaden the extension of asylum and status for those feeling persecution. Given the American heritage of concern for the homeless and persecuted, and our traditional role of leadership in promoting assistance for refugees, accession by the United States to the Protocol would lend conspicuous support to the effort of the United Nations toward attaining the Protocol's objectives everywhere. This impetus would be enhanced by the fact that most refugees in this country already enjoy the protection and rights which the Protocol seeks to secure for refugees in all countries." S.Exec.K, 90th Cong., 2d Sess. at III.

In the Senate the State Department submitted the statement of Mr. Laurence A. Dawson, Acting Deputy Director, Office of Refugee and Migration Affairs, which points out that

" . . . [W]hile the concept of guaranteeing safe and humane asylum is the most important element of the Protocol, accession does not in any sense commit the contracting state to enlarge its immigration measures for refugees. Rather, the asylum concept is set forth in the prohibition against the return of a refugee in any manner whatsoever to a country where his life or freedom would be threatened; and the prohibition under Article 32 against the deportation of a refugee lawfully in the territory of a Contracting State to any country except in cases involving national security or public order. The deportation provisions of the Immigration and Nationality Act, with limited exceptions, are consistent with this concept. The Attorney General will be able to administer such provisions in conformity with the Protocol without amendment of the Act.

\* \* \* \* \* \*

"[The President] has pointed out that since refugees in this country already enjoy the protection and rights which the Protocol seeks to secure everywhere, United States accession

should help to advance the Protocol and acceptance of its humane standards in other states whose treatment of refugees is less liberal . . . .
Even though the United States already meets the standards of the Protocol, formal accession would greatly facilitate our continuing diplomatic effort to promote higher standards of treatment for refugees and more generous practices on the part of countries whose approach to refugees is less liberal than our own." S.Exec. Rep. No. 14, 90th Cong., 2d Sess. at 6–7.

The following exchange at the Committee hearings also provides some insight as to the Senate's understanding of the Protocol:

"SENATOR SPARKMAN. Is there anything in here that conflicts with our existing immigration laws?

MR. DAWSON. I would answer that briefly and then ask Mrs. McDowell [of the Treaty Section, Office of the Legal Advisor, Department of State] to give a more authoritative answer. I would say that Article 32 which prohibits the expulsion of a refugee who is lawfully in this country to any country except on grounds of national security or public order would pose certain questions in connection with section 241 of our Immigration and Nationality Act, which states the deportation provisions. But I do not believe it would be in conflict. We believe most of those grounds in 241 are grounds which can be properly construed as having the basis of national security or public order, and we also are assured that those relatively limited cases which perhaps could not be so construed could be dealt with by the Attorney General without the enactment of any further legislation . . .

MRS. McDOWELL. I think Mr. Dawson has covered it very well. We are assured by the Justice Department that this is their view. That the existing regulations which have to do with deportation would permit the At-

torney General sufficient flexibility to enforce the provisions of this convention which are not presently contained in the Immigration and Nationality Act.

For example, section 241 of the Act allows the Attorney General to deport an alien for certain stated reasons. Most of these are criminal conduct of various kinds or subversive activities.

"There are two categories, only two, that we think are not covered, and these are the deportation of an alien for reasons of mental illness or deficiency, where he has become institutionalized for that reason, or deportation on grounds that he has become a public charge. These two areas would not be enforced against refugees if the protocol were in force." S.Exec. Rep. No. 14, 90th Cong., 2d Sess. at 8.

*Prior Decisions:*

It appears that in only two other cases have the issues here raised been considered. Kan Kam Lin v. Rinaldi, 361 F. Supp. 177 (D.N.J.1973); and In re Dunar, Board of Immigration Appeals, Interim Decision File No. A14 616, 395 (San Francisco April 17, 1973). In both cases the history discussed above was reviewed and it was decided that an alien who overstayed the legal limits of his admission into this country was no longer "lawfully" here and therefore could not claim the benefits of the Convention.

*Determination:*

The plaintiffs were legally admitted to this country pursuant to 8 U.S.C. § 1282 which permits an immigration officer "in his discretion . . . [to] grant the [alien] crewman a conditional permit to land temporarily pursuant to regulations prescribed by the Attorney General . . . and for a period of time, in any event, not to exceed" twenty-nine days. Each plaintiff improperly remained longer than the maximum permissible time and after appropriate hearings was found to be unlawfully in this country and deportable.

The immigration laws make certain provisions for achievement of lawful status by those here unlawfully, see *e. g.,* §§ 244(a), 245 and 249 of the Act, 8 U. S.C. §§ 1254(a), 1255, 1259. As was suggested in In re Dunar, *supra,* at 9:

"If we accepted respondent's view, all these, as well as the deportation provisions of section 241(a), would be rendered nugatory in the case of an alien refugee who entered lawfully as a nonimmigrant and remained unlawfully. If such an alien achieves nondeportability under Article 32 of the Convention, he becomes in effect a permanent resident. There is nothing in the legislative history of this provision to indicate that the Senate had any notion that this result would follow accession. Indeed, there is every indication that those who framed Article 32 on behalf of the United Nations never intended to saddle a host country with any such limitation."

Plaintiffs suggest that the strict interpretation of the "lawfully" renders the Convention without meaning since refugees are often in the country unlawfully. The simple answer here is that the Contracting States did not intend to protect refugees who unlawfully entered the country. Moreover, the cases now before me do not raise the more sympathetic claim of a refugee, forced to leave his own country covertly, who entered here illegally. The plaintiffs in these cases each enjoyed a period of legal status in this country and could have made their claims under the provisions of the Convention during that time—they did not do so.

The plaintiffs also suggest that new regulations governing the issuance of travel documents justify decision in their favor. 38 Fed.Reg. 8238 (1973) sets forth these amendments to 8 C. F.R. Plaintiffs point specifically to Part 223a, Refugee Travel Document, § 223a.3, Eligibility, which provides:

"Any alien physically present in the United States may apply for a refugee travel document if he believes he is a refugee. A refugee travel document

shall be issued to a refugee whose presence in the United States is lawful unless compelling reasons of national security or public order otherwise require. A refugee travel document may be issued in the exercise of discretion, to any other refugee unless reasons of national security or public order otherwise require; sympathetic consideration shall be given to such an application unless the Service intends to expel or exclude the alien from the United States. . . ."

Plaintiffs contend that "[f]rom this regulation it appears obvious that all refugees in the United States may obtain a travel document which would permit such refugees to reenter the United States." Plaintiffs' Memorandum of Law, at 18. They conclude that if a refugee can leave and return he ought to be allowed to remain without leaving.

■ The fallacy, however, is that it is not "obvious" at all that "all refugees" may get travel documents. Indeed, the regulation, in language quite similar to the Convention, provides that the travel document shall issue only if the presence of the refugee in this country is "lawful". The fact that this country may, in its discretion, issue documents to refugees here unlawfully, is not only in conformance with Article 28 of the Convention, but is of no help to the plaintiffs, since the Convention indicates that the purpose of this discretionary power was to permit travel by those who cannot be deported because they will not be accepted elsewhere.

■ The overwhelming and indeed uncontroverted evidence of the meaning of the Convention as revealed in all stages of its creation, adoption and interpretation lead me to conclude that plaintiffs' unlawful presence in this country precludes their invocation of rights under Article 32.

Plaintiffs' only remaining claim in this regard is that insofar as their claim under the Protocol is concerned, they never received a hearing on the lawfulness of their presence. Of course, in all cases either the Department of State or the Immigration and Naturalization Service, after a hearing made a determination that the aliens were not refugees but did not *at that time* consider the legal status of the plaintiffs. Since I have assumed, for the purposes of this decision, that the plaintiffs were refugees these hearings are not relevant. That is not to say, however, that the plaintiffs have not had the opportunity to contest a finding of unlawful status.

■ In each case the alien was originally afforded a deportation hearing, the precise purpose of which was to determine the status of their presence here. In both cases the plaintiffs admitted the unlawfulness of their status here, but even had they not done so (I doubt all the plaintiffs in all the related cases did so) those deportation hearings, followed by appropriate administrative and judicial appeals, were proper and adequate for a determination of the lawfulness question. The findings there made cannot now be attacked collaterally in this action, nor may plaintiffs claim they were not afforded the full panoply of due process rights in regard to the determination of their unlawful presence here. Kan Kam Lin v. Rinaldi, *supra.*

*State Department Review:*

When the Immigration and Naturalization Service receives a request for asylum as a political refugee it conducts a hearing to determine the facts of the case. Prior to January 1973, the Service would then send a brief statement of facts to the State Department for an opinion as to propriety of considering the alien a political refugee. If such status was denied to the alien he would be so advised by the Service.

By a letter of January 22, 1973 from Mr. Raymond W. Tangel, Director, Office of Refugee and Migration Affairs, Department of State, to Mr. James Greene, Associate Commissioner for Operations, Immigration and Naturalization Service, the procedure for the review of refugee status requests was

changed. That letter provides in pertinent part:

" . . . We recognize the problems raised by last-minute requests for asylum from aliens who could have applied earlier for a hearing under Section 243(h) of the Immigration and Nationality Act.

"In your letter you refer to the specific problem of citizens of the Peoples' Republic of China who fled to Hong Kong and have resided there for a substantial period of time. There is no likelihood that these aliens will be persecuted within the meaning of the Convention on Refugees if they are deported to Hong Kong nor have we any specific reason to believe that any of such persons will be returned by that government to countries where they will face such persecution. Our policy is to deny such requests for asylum provided: (a) they are deported to Hong Kong and not the Peoples' Republic of China and (b) that the Colony will accept them.

"We agree that such last minute requests concerning the return of Chinese to Hong Kong as described above can be handled by the Immigration and Naturalization Service without consultation with the Department through our office. We understand from your letter that during the deportation hearings all such aliens will have available to them the various benefits of the Immigration and Nationality Act, including withholding of deportation under Section 243(h) and the application of the Convention on Refugees whenever appropriate in their cases. . . ."

The plaintiff Lam Yim Yim objects to this new procedure claiming not that it in any way violates his rights directly, but rather that it is indicative of summary *disposition of these cases, rather than* the individual consideration to which each is entitled.

Inasmuch as this decision has assumed *arguendo* that all plaintiffs were refugees it is not necessary to de-

cide whether the administrative determination that plaintiff was not a refugee was properly arrived at. It should be noted, however, that while due process certainly requires that an alien receive full opportunity to present his claims, there is nothing in either the Convention or laws of this country which dictates that the State Department must be the final arbiter of all claims for refugee status. Thus, the mere fact that the Service, rather than the State Department, reviews an alien's claims would not appear to be objectionable in itself. In any event, this is not the proper case to review the applicable procedures because this decision rests solely on the unlawfulness of plaintiffs' presence and as to that issue they have had protection of adequate due process safeguards.

The plaintiffs' motion for a preliminary injunction is denied and the temporary restraining order heretofore entered is vacated. The defendants' motion for summary judgment is granted.

So ordered.