**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lawrence BULLOCK,**
**Defendant–Appellant.**

**No. 86–3063.**

United States Court of Appeals,
Seventh Circuit.

Argued April 15, 1988.

Decided Sept. 1, 1988.

See also 642 F.Supp. 982.

Sam Adam, Chicago, Ill., for defendant-appellant.

Lisa Huestis, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before RIPPLE, MANION and KANNE, Circuit Judges.

KANNE, Circuit Judge.

A jury found Illinois State Representative Larry Bullock guilty of several counts of mail fraud involving schemes to obtain rental payment from the state of Illinois and to gain Minority Business Enterprise certification on behalf of his business. The district court sentenced him to a total of six years of imprisonment followed by five years of probation and 800 hours of community service.

Bullock appeals the admission into evidence of other alleged fraud for which he was not indicted. He also challenges two jury instructions and the legality of his sentence. We affirm the district court.

## I. BACKGROUND

### A. *Rental Fraud*

Representative Larry Bullock obtained reimbursement from the state of Illinois for expenses he incurred in operating his legislative district office by filing vouchers with the state. Bullock initially paid a monthly rent of $500 to Midwest Cooler Service Co. for his district office at 2415 South Michigan Avenue in Chicago. Aside from serving in the legislature, Bullock owned and operated a majority of shares in Magnum Enterprises, Inc. In May, 1982, Magnum purchased the Michigan Avenue building where Bullock's district office was located. Part of the building was converted into a large banquet hall which Bullock sometimes used for his political activities.

In order to facilitate Bullock's reimbursement, attorney Adolphus Hall, through his company, Urban Vistas Realty and Management Co., acted as the manager of Bullock's building. The state paid Hall $600 per month rent from July, 1982 until October, 1984 for the rental of Bullock's building. Hall never received any compensation from either Bullock or Magnum. He simply deposited state checks into Bullock's account at Continental Illinois National Bank and made payments on Bullock's personal loan at Drexel National Bank. Hall terminated this arrangement with Bullock in the fall of 1984.

Bullock next asked Eugene Blackmon to act as a "technical conduit," and Bullock then falsified another lease, this time listing Blackmon & Associates as the building's new owner. Bullock also used this as an opportunity to increase the rent to $800 per month. Similarly as Hall had done, Blackmon deposited the state checks into an account at Chicago Bank of Commerce, into Bullock's mortgage account at Continental Illinois National Bank, and into Bullock's personal loan account at Drexel National Bank. Blackmon also paid Bullock's other creditors. Blackmon terminated Bullock's lease on December 18, 1984, by sending letters both to Bullock and to the state.

The *Chicago Sun–Times* exposed Bullock's leasing arrangement in June, 1985. Bullock then requested a legal opinion from the Illinois Attorney General and was advised that his conduct violated the Illinois Purchasing Act.[1]

Bullock was indicted and charged with rental fraud. The scheme began in July, 1982 and continued until November, 1984, with the state paying Magnum a total of $14,400. By January, 1985, approximately $7,500 had been paid to Magnum's mortgage account and between $4,500 and $5,000 had been paid on a personal loan incurred by Bullock. Additionally, the state of Illinois paid utility bills on the building during the time period in question.

### B. *Minority Business Enterprise Scheme*

Bullock's transgressions involved more than rental fraud. Additionally, the grand jury charged Bullock with a scheme to ob-

---

1. Bullock subsequently asked State Representative Gordon Ropp to sponsor an amendment to the Illinois statute which would eliminate any conflict of interest. Bullock did not tell Ropp of his own rental arrangement, and Ropp complied with Bullock's request. When Bullock's problems became public knowledge, Ropp withdrew the legislation.

tain money from governmental agencies in connection with several false and fraudulent Minority Business Enterprise ("MBE") applications that he signed. In 1984, Magnum entered the construction supply business and sought MBE certification in order to get public works projects from the government. In furtherance of this scheme, Bullock filed applications with state and local agencies including the Northeast Illinois Regional Commuter Railroad Corporation ("NIRCRC"), the Chicago Transit Authority ("CTA"), and the City of Chicago.

In his NIRCRC application, Bullock represented that Magnum had five employees and listed two individuals who had never received paychecks from Magnum. Bullock also listed three pages of equipment, with a total value of $150,000, which actually belonged to another company and was loaned to Magnum for an unrelated venture. Further, Bullock underestimated Magnum's gross receipts for 1982, and stated that Magnum "provides 70% of the work on projects with our own forces," although Magnum had neither *any* prior projects nor *any* work force.

In Bullock's application with the City of Chicago, he falsely listed three separate supplier contracts, work he had not performed, and equipment that did not belong to him as well as again overstating Magnum's gross receipts.

When accused of wrongdoing, Bullock attempted to avoid his responsibility by claiming that he gave the applications merely a cursory review, that they were prepared by his staff, and that he believed the information was correct. Trying to characterize the misstatements as inadvertent mistakes rather than deliberate falsifications, Bullock testified that the $150,000 worth of equipment he listed had been pledged to Magnum pursuant to a joint venture agreement with another company. He further testified that although it was untrue that he had any 1984 contracts, he had done some work for some of the companies in 1985.

## C. *Basis of Bullock's Appeal*

During the trial, the district court allowed the prosecution to introduce evidence regarding MBE applications other than those for which Bullock was indicted. Bullock appeals the introduction of other "bad acts" under Fed.R.Evid. 404(b). Specifically, Bullock objects to references to a controversial letter contained in the MBE application he submitted to the Illinois Department of Transportation ("IDOT"). That letter, along with a list of equipment, was allegedly sent to Bullock by Albert Hoecker, president of NCS Construction Supply Business. Mr. Hoecker denies writing or authorizing this letter which was not prepared by his secretary and contains a misspelling of his name. The letter states that NCS and Magnum entered into a joint venture agreement to supply materials to Magnum's clients and that certain inventory owned by NCS would be available to Bullock. IDOT relied on the information contained in this document in making its determination to certify Magnum.

Bullock challenges the district court's refusal to tender jury instructions concerning the materiality of the fraudulent information in the MBE applications. He additionally appeals the trial court's refusal to instruct the jury that the government had to prove a statutory violation.

Finally, Bullock claims that the trial court erroneously used the United States Sentencing Commission's preliminary draft sentencing guidelines in imposing his sentence. Since these guidelines had not yet been approved, Bullock contends that any reliance by the court was erroneous.

We will address each of Bullock's claims in turn.

## II. ANALYSIS

### A. *Evidence of Other Bad Acts*

During Bullock's trial, the prosecution referred to MBE applications he had submitted to the Illinois Department of Transportation and to the Illinois Central Gulf Railroad. Bullock claims that the court erred in allowing this information as evidence of other bad acts under Fed.R.Evid.

404(b). He contends that unlike his other MBE applications, these particular applications were not included in the indictment, and therefore, it was unduly prejudicial for the jury to hear of them.

On review, we will not disturb Judge Shadur's decision to admit evidence under Rule 404(b) unless the finding constitutes an abuse of discretion. *United States v. Pirovolos,* 844 F.2d 415, 422 (7th Cir.1988); *United States v. Swiatek,* 819 F.2d 721, 727 (7th Cir.1987); *United States v. Brown,* 688 F.2d 1112, 1115 (7th Cir.1982).

■ Federal Rule of Evidence 404(b) provides that evidence of other crimes, wrongs or acts cannot be introduced to show the defendant's bad character or to show his propensity to commit the crime. However, it may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This court held in *United States v. Chaimson,* 760 F.2d 798, 804 (7th Cir.1985) that:

> Evidence of other acts is admissible if '(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar and close enough in time to be relevant to the matter in issue ... (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of prejudice.'

(*quoting United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984)); *See also United States v. Tuchow,* 768 F.2d 855, 862 (7th Cir.1985); *United States v. Stump,* 735 F.2d 273, 275 (7th Cir.), *cert. denied,* 469 U.S. 864, 105 S.Ct. 203, 83 L.Ed.2d 134 (1984).

Bullock claims that the references to the Hoecker letter create an innuendo that he forged Hoecker's name, a "bad act" for which he was not indicted and one his commission of which was never proven. The government contends that they submitted the letter not to prove that Bullock forged it, but that Bullock knew the information contained in the letter was false when he submitted it to IDOT.

Judge Shadur allowed the reference to the IDOT application because CTA relied on it in granting Magnum's MBE certification. Bullock was indicted in connection with his CTA application, and the reference was therefore probative of the acts charged in that indictment.

■ Bullock alternatively argues that the evidence was erroneously admitted because the government had allegedly promised to give specific notice of its intent to use such evidence in advance of the trial and did not do so. However, the record indicates that Bullock was given the IDOT application a week before the trial and all of the MBE applications were available to him before trial. It is simply impossible to accept Bullock's claim that he should be given a new trial because he was not given notice of the other "bad acts" evidence and was thus unable to defend, investigate, and adequately confront that evidence. This argument is particularly unavailing when Judge Shadur specifically allowed defendant's counsel "full reign" to cross-examine and recall witnesses in order to allow him to thoroughly confront the evidence.

A similar fact scenario was involved in *United States v. Martel,* 792 F.2d 630 (7th Cir.1986). There the defendant sought to exclude the admission of a letter under Fed.R.Evid. 404(b). The court of appeals affirmed the district court's admission of the letter, concluding that "the trial judge acted with sound discretion when he determined that the letter was relevant because the letter on its face created legitimate inferences which made the defendants' intent to defraud a more or less likely proposition." *Id.* at 635.

### B. *Jury Instructions*

Bullock appeals the trial court's refusal to tender two of his proposed jury instructions.

#### 1. *Materiality*

■ Bullock insists that the jury should have been given an instruction regarding the materiality of the false statements

made on the MBE applications. Bullock urges us to adopt the rule in the Ninth and Tenth Circuits and submit the question of materiality to the jury. However, the case law in this circuit is directly to the contrary and holds that materiality is a question of law for the court. *United States v. Shriver*, 842 F.2d 968 (7th Cir.1988) (materiality is a question of law that is decided by the court in prosecutions under 18 U.S.C. § 1001); *Martel*, 792 F.2d at 637; *United States v. Brantley*, 786 F.2d 1322, 1327 (7th Cir.1986), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). Therefore, Judge Shadur properly refused to give the question of the materiality of the Bullock's false statements to the jury.

### 2. *Statutory Violation*

■ Second, Bullock appeals the trial court's refusal to give a jury instruction he proposed regarding the government's duty to prove a statutory violation. Bullock requested the court to instruct the jury that "to convict the defendant of mail fraud where a state official's reliance upon a state statute supports the scheme to defraud, the government must prove beyond a reasonable doubt that the statute was violated." Bullock now claims that this impeded his "right to a jury instructed on the theory of the defense." The district court refused to give this instruction, and although he did not withdraw the tendered instruction, neither did Bullock object and state his grounds for having the instruction given to the jury. This court has held that merely submitting an instruction is insufficient to preserve the right to appeal. *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987); *United States v. Brown*, 739 F.2d 1136, 1143 (7th Cir.1984), *cert. denied*, 437 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); *United States v. Jackson*, 569 F.2d 1003, 1009–10 (7th Cir.1978), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978).

Bullock did not make a proper objection to the court's refusal to give it,[2] as re-

quired by Fed.R.Crim.P. 30, which provides in relevant part:

> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

We wrote recently that Rule 30 means what it says when it "requires that the 'grounds of objection' be stated—a requirement taken seriously in this circuit." *United States v. Kerley*, 838 F.2d 932, 936 (7th Cir.1988, modified on other grounds, Mar. 23, 1988); *United States v. Kehm*, 799 F.2d 354, 362–63 (7th Cir.1986); *United States v. Kuecker*, 740 F.2d 496, 503 (7th Cir. 1984). Since this issue was not properly preserved, we do not have to discuss the merits of his claim.

### C. *Sentence*

#### 1. *Legality*

■ The jury convicted Lawrence Bullock of nine counts of mail fraud, 18 U.S.C. § 1341, and three counts of making false statements, 18 U.S.C. § 1001. These statutes each carry a maximum imprisonment period of five years.

If the court had given Bullock the maximum sentence on each count of which he was found guilty, his total sentence would have been sixty years. Instead, Judge Shadur imposed a six-year sentence, stating:

> It is the sentence of this Court that on Counts 9, 19, 11, 13, 14, and 17 of the Indictment, and the Count of the superseding information that we treat as Count 16, because it replaced Count 16, defendant, Lawrence Bullock is committed to the custody of the Attorney General for a term of six years.

This sentence was to be followed by a probationary period of five years and an 800 hour community service obligation. As Judge Shadur stated:

---

**2.** Moreover, after the judge ruled, Bullock's attorney told the court, "I agree it's a legal deci-

sion as to whether or not the statute applies."

With respect to Counts 7, 8, 12, 15, and 18 the imposition of sentence is suspended. Mr. Bullock, you are placed on probation for a term of five years consecutive to the time served in actual custody on the other Counts, on the general terms and conditions of probation, and the further term that you are to perform 800 hours of community service at the rate of 50 hours per calendar quarter. . . .

Bullock accuses the trial court of imposing an illegal sentence because the six-year sentence was in excess of a maximum five years of incarceration provided for in the sentencing statutes regarding mail fraud and false statements. The government is in accord with the request to remand to correct the sentence, but alleges that the error in the sentence is merely a clerical error because the wording of the judgment and commitment order is unclear.

Judge Shadur obviously intended to sentence Bullock to a total of six years imprisonment (on Counts 9, 10, 11, 13, 14, and 17 of the Indictment and on the Count of the superseding information, which carried a combined maximum period of imprisonment of 35 years). However, the wording of the judgment and commitment order creates a possible ambiguity. That order provides:

> The defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of SIX (6) YEARS on Counts 9, 10, 11, 13, 14, and 17 of the indictment and Count 1 of the superseding criminal information to run concurrently as to said counts.
>
> IT IS FURTHER ORDERED that on Counts 7, 8, 12, 15, and 18 of the indictment, the imposition of sentence is suspended and defendant is placed on probation for a period of FIVE (5) YEARS, to run concurrently as to said counts, and consecutive to the sentence imposed on Counts 9, 10, 11, 13, 14, and 17 of the indictment and Count 1 of the superseding criminal information.

This language could be interpreted as imposing a six-year sentence for a single count. That interpretation, however, does not reflect the court's intended sentence. Therefore, we will remand the sentence for correction pursuant to Fed.R.Crim.P. 35(a) and 36. *United States v. Thomas*, 774 F.2d 807, 814 (7th Cir.1985), *cert. denied*, 475 U.S. 1024, 106 S.Ct. 1218, 89 L.Ed.2d 329 (1986).

### 2. *Reliance on Sentencing Guidelines*

■ Bullock alternatively charges that the district court improperly relied on the United States Sentencing Commission's preliminary draft guidelines because they had not been officially adopted. He asks that his case be remanded in order that the district court may conduct a new sentencing hearing.

The United States Sentencing Commission's letter accompanying the preliminary draft guidelines did not oblige Judge Shadur's reliance. While Judge Shadur stated that he consulted the Sentencing Commission's preliminary draft guidelines in imposing Bullock's sentence, he did not indicate that he *relied* on it. The draft proposed a range of 6½ years to 8 years for this misconduct. The ultimate sentence of 6 years was not within the draft's suggested range of 6½ years to 8 years.

Bullock also contends that the use of the sentencing guidelines violated the prescription against *ex post facto* laws, quoting *Miller v. Florida*, — U.S. —, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), where the Court ruled that the use of sentencing guidelines adopted after the commission of an offense violated the prescription of *ex post facto* laws notwithstanding the fact that the actual statutory minimum and maximum sentences had not been altered. *See also Lindsey v. Washington*, 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937).

However, the record does not support Bullock's claim since Judge Shadur articulated several factors that he evaluated in imposing Bullock's sentence; his consultation of the draft sentencing guideline was irrelevant to the validity of the sentence.

### III. CONCLUSION

References to the MBE applications for which Bullock was not indicted were inter-

twined with the testimony regarding the crimes for which Bullock was indicted. The district court's ruling admitting such evidence was clearly supported by Fed.R. Evid. 404(b) and the case law in this circuit.

The district court's refusal to give an instruction on the materiality of the false statements was, likewise, in accord with the case law in this circuit. The claim that the district court's refusal to instruct the jury regarding the mail fraud burden of proof need not be considered; Bullock did not properly state his grounds for objection and did not preserve the right to appeal.

Finally, the trial judge imposed a permissible sentence and did not improperly rely on the Sentencing Commission's preliminary draft guidelines. We therefore AFFIRM the judgment of the district court. However, because the wording of the judgment and commitment order is ambiguous, we REMAND solely for correction of the wording in that order.