**UNITED STATES of America**

v.

**Mohammad NASERKHAKI.**

**Crim. No. 89–00108–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 18, 1989.

Christine Wright, Asst. U.S. Atty., Alexandria, Va., for plaintiff.

Marvin D. Miller, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a prosecution of a resident alien for making material false statements to the United States Immigration and Naturalization Service ("INS"). A jury convicted defendant (i) of violating 18 U.S.C. § 1001 by making two false statements in an application submitted to the INS for a Refugee Travel Document ("RTD") and (ii) of violating 18 U.S.C. § 1546 by using the fraudulently obtained RTD to enter the United States on three different occasions.[1] Defendant now seeks acquittal, or a new trial, pursuant to Fed.R.Crim.P. 29(c), on the ground that the allegedly false statements in his RTD application were not material, as required by law.

For the reasons stated here, the Court concludes that only one of the two misrepresentations was material. Because the jury's verdict did not separately address each misrepresentation, there is no reliable means of ascertaining whether the jury's verdict was based on one or both misrepresentations and, if on one, which one. Accordingly, defendant is entitled to a new trial.

### Facts

Defendant, an Iranian national, was forced to flee his country after the Khomeini regime came to power. He entered the United States in July, 1982 through Los Angeles International Airport. At that time, defendant was classified as a student. In August 1985, pursuant to 8 U.S.C. § 1158(a), the Attorney General granted defendant refugee status as a political asylee.[2] Soon after entering the United States, defendant moved to Virginia. In Virginia, defendant has participated in political activities aimed at the overthrow of the current Iranian government. These efforts continue to this day.

This prosecution grows out of two RTD applications made by defendant. In es-

1. Defendant was also indicted for obstruction of justice in violation of 18 U.S.C. § 1505. At the close of the prosecution's case-in-chief, the Court dismissed this charge pursuant to Fed.R. Crim.P. 29(a).

2. A refugee is a "person unable or unwilling to return to ... [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Defendant's asylee status can be revoked only if the Attorney General determines that defendant is no longer a refugee due to "a change in [political] circumstances" in Iran. 8 U.S.C. § 1158(b). No such change in circumstances has occurred. Thus, defendant retains his political asylee status.

sence, an RTD is the functional equivalent of a passport for the refugees. It provides refugees who travel to other countries with documentation that they are legal residents of the United States. Refugees in possession of RTDs can travel to other countries and then reenter the United States legally on their return.

In 1986, defendant visited Canada, allegedly fleeing a death squad sent by the Iranian government. By the fall of 1986, defendant was back in the United States. On October 1, 1986, while in New York, defendant applied for an RTD at the New York INS office and requested that it be issued that same day. He was informed that the New York office could not comply with this request because his file was located in the INS office in Virginia. Given this, defendant chose not to pursue obtaining an RTD in New York. Instead, a week later, on October 8, 1986, defendant filed another RTD application in Arlington, Virginia. In completing the Virginia application, defendant made the two misrepresentations here at issue. First, defendant noted on the form that he had not previously applied for an RTD from the United States.[3] Second, defendant claimed that he had last entered the United States in Los Angeles in the early 1980's. Both statements were false. Contrary to his answers on the RTD application, defendant had submitted an RTD application in New York only the week prior, and had most recently reentered the United States from Canada, through Michigan, not California. Unaware of these misrepresentations, the INS issued the RTD. Thereafter, defendant used the RTD to enter the United States on

three occasions: in June 1987, September 1987 and May 1988.[4]

In October 1986, the Federal Bureau of Investigation commenced investigation of the case at bar. In March 1989, a five count indictment was returned against the defendant.[5] Count I charged defendant with:

[K]nowingly, wilfully and unlawfully making, using and submitting a false application and supporting documents to the Immigration and Naturalization Service on or about October 7, 1986 [6] for the purpose of obtaining a Refugee Travel Document, in violation of 18 U.S.C. § 1001.

Counts II, III and IV charged defendant with "knowingly wilfully and unlawfully using a fraudulently procured RTD to enter the United States on or about" June 2, 1987, September 18, 1987 and May 8, 1988 respectively, all in violation of 18 U.S.C. § 1546. Thus, finding the defendant guilty of fraudulently obtaining an RTD through false statements, as charged in Count I, was a necessary predicate to finding defendant guilty on Counts II, III and IV.

At trial, Phyllis Howard, a 20–year employee of INS, was the government's principal witness on the materiality of both misstatements. On this issue, Howard testified that an applicant's representation concerning the date and place of the applicant's last entry into the United States is important because it provides the INS agent processing the application with information pertinent to (i) whether the applicant's entry into the United States was legal and (ii) whether the applicant has undertaken any travel that would jeopard-

---

3. Defendant contended at trial that he withdrew his New York RTD application when he learned it could not be issued that same day. The government, on the other hand, claimed that the application was never withdrawn. Even accepting defendant's contention that he withdrew the New York application, the answer given in his Virginia application was incorrect. The question did not ask for the resolution of his prior application. It only asked whether defendant had ever previously applied for an RTD.

4. In October 1986, defendant filed an application for permanent residence status that is still pending.

5. Defendant unsuccessfully moved to dismiss the indictment on the basis of pre-indictment delay. *United States v. Naserkhaki,* 713 F.Supp. 190 (E.D.Va.1989).

6. Defendant completed the Virginia RTD application form on October 7, 1986. He did not submit this application to the Arlington INS office until October 8, 1986. This explains the one-day discrepancy between the date listed in the indictment and the date on which defendant actually filed his application form.

ize his asylee status. In response to a hypothetical question, Howard stated that a misrepresentation concerning the last date or place of United States entry would cut off an INS line of inquiry as to the foreign countries visited and the reason for the travel. In so limiting inquiry, she explained, the INS examiner would be deprived of the opportunity to determine whether the applicant was entitled to retain asylee status. Howard also testified, in conclusory fashion, that the applicant's failure to notify the INS Arlington office of the New York RTD application was material. Howard stated that the fact that an applicant made a prior application for an RTD "may or may not" affect the examiner's consideration of the present RTD; it would depend on what was submitted in support of the application and whether the previous application had been denied. Yet Howard did not explain how supporting documents or a prior denial of an RTD would be germane to the examiner's consideration of the present RTD application under the criteria set out in the regulations. Howard also broadly asserted that an examiner needs to know of prior RTD applications to determine if the applicant continues to be an asylee, but her testimony never clarified how this determination could be made from knowledge or examination of the mere *application* for an RTD. On cross examination, Howard conceded

that defendant, as a refugee, ordinarily would be entitled to the issuance of the RTD. Even so, she explained, the issuance of the RTD would not necessarily be automatic.[7] In this regard, Howard offered an example of a political asylee requesting an RTD to travel to the country from which the applicant had claimed asylum. Such a request may indicate that political asylee status is no longer appropriate because the applicant apparently no longer fears for his or her life.

At the conclusion of the evidence, the Court instructed the jury, *inter alia,* that both alleged misstatements were material. Following deliberations, the jury found the defendant guilty of the charges in Counts I through IV of the Indictment. Specifically, the jury concluded that defendant's RTD application included material misstatements in violation of 18 U.S.C. § 1001 and that he subsequently used the fraudulently obtained RTD to enter the United States on three occasions in violation of 18 U.S.C. § 1546. This motion for acquittal, or a new trial, followed.

## *Analysis*

■ Analysis of the motion at bar properly begins with recognition of the settled principle that the materiality of misrepresentations charged under 18 U.S.C. § 1001 is a question of law for the Court.[8] The

7. See *Ming v. Marks,* 367 F.Supp. 673, 680 (S.D. N.Y.1973), *cert. denied,* 421 U.S. 911, 95 S.Ct. 1564, 43 L.Ed.2d 776 (1975) in which the court stated, in the context of plaintiffs' action to enjoin their deportation and obtain asylee status, that "it is not 'obvious' at all that 'all refugees' may get travel documents."

8. See *Kungys v. United States,* 485 U.S. 759, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988); *Russell v. United States,* 369 U.S. 749, 755–59, 82 S.Ct. 1038, 1041–44, 8 L.Ed.2d 240 (1962) (materiality under perjury statute, § 192, is a question of law for the trial court); *Braden v. United States,* 365 U.S. 431, 435–38 & n. 6, 81 S.Ct. 584, 587–88 & n. 6, 5 L.Ed.2d 653 (1961) (same); *Sinclair v. United States,* 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929); *United States v. Bullock,* 857 F.2d 367 (7th Cir.1988); *United States v. Greenberg,* 842 F.2d 1293 (4th Cir.1988) (unpublished opinion) ("The question of materiality is one of law and is to be decided by the trial court."); *Nilson Van & Storage Co. v. Marsh,* 755 F.2d 362 (4th Cir.), *cert. denied,* 474 U.S. 818,

106 S.Ct. 65, 88 L.Ed.2d 53 (1985); *United States v. Norris,* 749 F.2d 1116, 1122 (4th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985); *United States v. Lopez,* 728 F.2d 1359 (11th Cir.1984); *United States v. Abadi,* 706 F.2d 178, 180 (6th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983); *United States v. Fern,* 696 F.2d 1269 (11th Cir. 1983); *United States v. McIntosh,* 655 F.2d 80 (5th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982); *United States v. Adler,* 623 F.2d 1287 (8th Cir.1980); *United States v. Lichenstein,* 610 F.2d 1272 (5th Cir.), *cert. denied sub nom., Bella v. United States,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *United States v. Schaffer,* 600 F.2d 1120 (5th Cir.1979); *United States v. Winkle,* 587 F.2d 705 (5th Cir.), *cert. denied;* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *see also United States v. Taylor,* 693 F.Supp. 828, 832 (N.D.Cal.1988) (quoting *Luse v. United States,* 49 F.2d 241, 244–45 (9th Cir.1931) ("Whether the testimony alleged to be perjured was material to such

next step in the analysis is to define the standard by which to measure the materiality of defendant's misstatements. Defendant argues that the appropriate materiality standard, found in *Kungys v. United States*, 485 U.S. 759, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988), "is whether or not the misrepresentation would have actually affected the conclusion at issue." Defendant's Reply, dated July 6, 1989 at 11. Defendant's argument is only half right; the appropriate standard can be found in *Kungys*, but defendant misreads that decision and thus misstates the standard.[9] A review of *Kungys* is instructive.

■ *Kungys* involved an attempt by the government to have petitioner denaturalized pursuant to 8 U.S.C. § 1451(a).[10] Three grounds were alleged for the denaturalization: (i) that petitioner had participated in the 1941 execution of Lithuanian citizens, (ii) that petitioner had falsely stated his place and date of birth in his visa and naturalization applications, and (iii) that petitioner's citizenship had been illegally procured under § 1451 for lack of "good moral character" required by 8 U.S.C. § 1427(a). It is the Supreme Court's treatment of the second ground that is chiefly relevant here.[11] Speaking for a majority,[12] Justice Scalia held, *inter alia*, that the test for materiality under 8 U.S.C. § 1451(a) is no different from the materiality standard used in connection with a number of federal statutes criminalizing the making of false statements to public officials. The most prominent of these statutes being 18 U.S.C. § 1001. *Kungys*, 108 S.Ct. at 1546. This holding makes *Kungys*, a denaturalization case, relevant to the instant § 1001 false statement case. After equating "materiality"

issues is a question of law."). *But see United States v. Valdez*, 594 F.2d 725 (9th Cir.1979) (since materiality is an essential element of the offense of making false statements to the United States, it must be determined by the jury).

9. Defendant also misstates the standard through a misplaced reliance on, and misreading of, the Foreign Affairs Manual ("FAM"). Citing the FAM, defendant argues that a false statement is material only if "the true facts of the matter disclosed a situation rendering the alien *ipso facto* ineligible." This argument has two fatal faults. First, the FAM is not applicable here. By its terms, the FAM addresses not RTD applications, but "[a]liens ineligible to receive *visas*." 22 C.F.R. § 42.91(a)(19) (emphasis added). Second, even assuming its applicability, the FAM is not unequivocal support for defendant's claim that a "but for" test for materiality is appropriate in this context. *See Foreign Affairs Manual*, 22 C.F.R. 42.91, notes 6.1–6.31, framing the materiality test in terms of the misrepresentation's tendency to shut off a line of inquiry relevant to the alien's eligibility.

10. This provision states, in pertinent part, as follows:

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 1421 of this title in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation....

11. The Court did not discuss the first ground, the district court having concluded that there was insufficient evidence to sustain the charge that petitioner had participated in the 1941 executions of a number of Lithuanians.

As for the second and third grounds, a majority of the Court remanded to the Third Circuit for the determination whether the misrepresentations and concealments (i) were supported by the evidence, (ii) were material under the standard articulated by Justice Scalia and (iii) were instrumental in petitioner's procuring his citizenship. *Kungys*, 108 S.Ct. at 1549.

12. Five opinions were filed in this case. Justice Scalia wrote for a plurality on various issues, but for a majority on the issue of the proper materiality standard. He was joined on this point by the Chief Justice and Justices Brennan, White, and O'Connor.

Justice Stevens, joined by Justices Marshall and Blackmun, concurred in the judgment, but characterized the materiality standard as a "but for" test. They concluded that to demonstrate that citizenship was 'procured by' a material misrepresentation, the government must show that "but for" the misrepresentation, the government would not have conferred citizenship. Therefore, under this test, the government must show the existence of some fact, that "but for" the misrepresentation, would have compelled the denial of citizenship. *Kungys*, 108 S.Ct. at 1553–62 (Stevens, J. concurring).

Justice Kennedy did not participate in the consideration of this case.

under 8 U.S.C. § 1451(a) with that under 18 U.S.C. § 1001 and other like statutes, Justice Scalia went on in *Kungys* to frame the common materiality standard as follows:

> [W]hether the misrepresentation or concealment was predictably capable of affection, *i.e.*, had a natural tendency to affect, the official decision.

108 S.Ct. at 1547. This formulation, not surprisingly, has a long pedigree in § 1001 decisional law.[13] It is, moreover, fully consistent with Congress' purpose in enacting a broad false statements statute.[14]

With the materiality standard thus defined, the final step in the analysis is the application of the standard to the two misrepresentations in issue. Thus, the question in this step of the analysis, is whether defendant's misstatements concerning (i) his last date and place of entry into the United States and (ii) his filing of the RTD application in New York "had a natural tendency to affect" the INS decision to issue the RTD. *Kungys*, 108 S.Ct. at 1547. The answer with respect to the misrepresentation of the date and place of entry is plainly yes. Equally plain is that a negative answer must be given with respect to the misrepresentation concerning the previous New York RTD application. Given the criteria for the issuance of an RTD, it appears, on this record, that a misrepresen-

tation concerning date and place of entry into this country would have a natural tendency to affect the RTD issuance decision, but the failure to report the New York application would not.

The regulations establish the criteria for the issuance of an RTD. They provide that a refugee "physically present in the United States may apply for [an RTD]," and that an RTD "*shall* be issued to a refugee whose presence in the United States is lawful, unless compelling reasons of national security or public order otherwise require." 8 C.F.R. § 223a.3. (emphasis added). Lawful presence requires presence that is not "so brief as not to signify residence even of a temporary nature." *Id.* Thus, an INS examiner presented with an RTD application must make the following inquiries:

> (i) First, is the applicant a political asylee?
>
> (ii) If so, is the applicant lawfully present in the country?
>
> (iii) Nonetheless, are there compelling reasons of national security or public order that require withholding the issuance of an RTD?

These inquiries do not, on their face, implicate the information defendant misstated concerning his prior New York RTD application. Put another way, the existence of a New York application simply does

---

**13.** *See United States v. Rodriguez–Rodriguez,* 840 F.2d 697 (9th Cir.1988) ("To be material, a statement need only have the propensity or capacity to influence or affect an agency's decision."); *United States v. Corsino,* 812 F.2d 26, 31 (1st Cir.1987) ("If a statement could have provoked agency action, it is material whether or not ever relied on."); *United States v. Vaughn,* 797 F.2d 1485, 1490 (9th Cir.1986) ("A statement is considered material if it has the propensity to influence agency action."); *United States v. Norris,* 749 F.2d 1116, 1122 (4th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 496 (1985) ("The test of materiality is whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action."); *United States v. Ramos,* 725 F.2d 1322, 1324 (11th Cir.1984) (same); *United States v. Diggs,* 613 F.2d 988, 999 (D.C.Cir.), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980) ("Proof of actual reliance on the statement is not required; the Government need only make a reasonable showing of its potential effects."); *United States v. DiFonzo,* 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied,* 444 U.S.

1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *United States v. Rose,* 570 F.2d 1358, 1364 (9th Cir.1978); *United States v. Goldfine,* 538 F.2d 815, 820–21 (9th Cir.1976) (statements were material even though investigators were not misled by false answer); *United States v. McGough,* 510 F.2d 598, 602 (5th Cir.1975); *United States v. East,* 416 F.2d 351, 353 (9th Cir.1969); *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C.Cir.1956).

**14.** As one court noted,

> [T]he conduct Congress intended to prevent by § 1001 was the willful submission to federal agencies of false statements calculated to induce agency reliance or action, irrespective of whether actual favorable agency action was, for other reasons, impossible.

*United States v. Valdez,* 594 F.2d 725, 729 (9th Cir.1979), quoting *United States v. Quirk,* 167 F.Supp. 462, 464 (E.D.Pa.1958), *aff'd* 266 F.2d 26 (3d Cir.1959); *see also United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941).

not bear on the examiner's consideration of i) defendant's asylee status, ii) defendant's lawful presence in the United States, or iii) the presence or absence of compelling national security or public order reasons for denying the application.[15] And, the government, the party with the burden on this issue, did not present adequate, persuasive evidence to the contrary.[16] In sum, the New York application is immaterial because it is irrelevant to defendant's eligibility for an RTD.

Case law supports this conclusion. It demonstrates that materiality requires a much closer fit than is offered here between the particular misstatement and the relevant criteria for eligibility. In general, materiality under Section 1001 requires that a misstatement be relevant to a fact that is a precondition to the grant of the particular INS benefit sought. *See Tzantarmas v. United States,* 402 F.2d 163 (9th Cir.1968), *cert. denied,* 394 U.S. 966, 89 S.Ct. 1312, 22 L.Ed.2d 569 (1969) (a misstatement by a Greek alien that he had never been married was material in the context of the alien's attempts to legalize his status in the United States on the basis of his bigamous marriage to an American); *United States v. Diogo,* 320 F.2d 898 (2d Cir.1963), *aff'd sub nom., United States v. Bolden,* 28 M.J. 127 (1989) (a misstatement concerning the validity of a marriage was material because it was an element of the crime charged); *United States v. Popow,* 821 F.2d 483 (8th Cir.1987) and *United*

*States v. Ramos,* 725 F.2d 1322 (11th Cir. 1984) (giving a fictitious identification is material to an inspector's determination to admit a person into the United States or to issue a person a passport, since name and identity are critical to these decisions); *United States v. Lopez,* 728 F.2d 1359 (11th Cir.1984) (a false priority date on an application for permanent resident status is material because the priority date determines the order in which resident aliens are granted residency); *United States v. Valdez,* 594 F.2d 725 (9th Cir.1979) (a false assertion as to the existence of an employment offer in a visa application is material because an employment offer is one means by which a visa applicant can show that the applicant is not likely to become a public charge); *see also United States v. Carrier,* 654 F.2d 559, 561–62 (9th Cir.1981) (a false negative response to a customs inspector's query whether the defendant was carrying more than $5000 in currency is material because it had a tendency to affect the inspector's duty to require persons entering the United States to file a currency report form).

Where, as here, a misstatement relates to an ancillary, non-determinative fact, it is not material and cannot support a conviction under Section 1001. *See United States v. Qaisi,* 779 F.2d 346, 348 (6th Cir.1985), *reh'g denied,* 786 F.2d 242 (1986) (false statements regarding viability of a marriage, in contrast to validity of a mar-

---

**15.** The fact that defendant was untruthful does not, by itself, meet the materiality standard. "[F]or purpose of determining the natural tendency of a misrepresentation to affect a decision ... what is relevant is what would have ensued from official knowledge of the misrepresented fact ... *not what would have ensued from official knowledge of inconsistency between a posited assertion of truth and an earlier assertion of falsehood." Kungys,* 108 S.Ct. at 1548–49 (emphasis added).

**16.** An integral part of applying the materiality standard is the burden of proof to be applied to any factual predicates involved in whether a misrepresentation has a natural tendency to affect the official decision. Perhaps because it is rarely raised or disputed, few courts have addressed this issue. Those that have considered the issue have done so only in passing or without sharp focus. *See Kungys v. United States,*

485 U.S. 759, 108 S.Ct. 1537, 1547, 99 L.Ed.2d 839 (1988) (requiring that materiality, in the deportation context, be shown by "clear, unequivocal, and convincing evidence," citing *Schneiderman v. United States,* 320 U.S. 118, 158, 63 S.Ct. 1333, 1352, 87 L.Ed. 1796 (1943); *United States v. Martinez,* 855 F.2d 621 (9th Cir.1988) (holding that the government need not prove materiality beyond a reasonable doubt, but that it must advance "some showing"); *United States v. Lakey,* 610 F.Supp. 210, 212 (S.D. Texas 1985) (concluding, without explanation, that the government must prove beyond a reasonable doubt that the false statement "related to a material matter"). In the instant case, the question whether the government's burden is beyond a reasonable doubt, or less, is not determinative because the government's evidence does not rise even to the level of a preponderance.

riage, are not material because viability is not a criteria for determining whether to confer "immediate relative" status); *see also United States v. Facchini,* 874 F.2d 638, 644 (9th Cir.1989) (false income statements not material when amount of employment benefits paid were based on administrative expenses, not income). In sum, a misstatement in this context is material only if it relates to a fact or circumstance the INS examiner considers in deciding whether to issue an RTD. The misstatement must have "the natural tendency to influence agency action or [be] capable of influencing agency action." *United States v. Norris,* 749 F.2d at 1122. The record evidence here disclosed no such relation or connection between the misstatement concerning the prior New York application and the decision to issue the RTD.[17]

■ Defendant's other misrepresentation, however, stands on a different footing. His false statements that he had not been out of the country since the early 1980's and that his last entry into the United States had been through Los Angeles, relate directly to his eligibility for an RTD. Defendant's lawful presence in the United States is called into question by the fact that he had recently returned from Canada. To meet the lawful presence requirement, defendant's stay in other countries may not be so extensive as to render his presence in the United States only brief or temporary. 8 C.F.R. § 223a.3. The examiner, equipped with the accurate information about defendant's travels, would likely have questioned defendant further about his excursions outside the United States to determine defendant's eligibility for an RTD. As Phyllis Howard's testimony shows, the defendant's date and place of last arrival is critical to the examiner's decision making process.

[W]ith an asylee, any prior departures from the United States have to be looked at to determine how long the absences have been outside of the United States. We're looking to determine if possibly any firm or settlement happened in an-

other country and that he was inspected and admitted on all prior entries to the United States.

Thus, defendant's misrepresentation was plainly "capable of influencing" the examiner's decision to grant or deny the RTD. *United States v. Norris,* 749 F.2d at 1122. It is therefore material under 18 U.S.C. § 1001. This conclusion is supported by the case law cited above (*See supra,* at 13–15).

■ Since only one of defendant's misstatements satisfies Section 1001's materiality requirement, and since the jury rendered a general verdict, it is not possible to determine whether the verdict rests in whole, or in part, on the immaterial misstatement. Accordingly defendant's conviction is infected with error and cannot stand. Abundant authority requires that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground." *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *Yates v. United States,* 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957); *Terminiello v. Chicago,* 337 U.S. 1, 5–6, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949); *Cramer v. United States,* 325 U.S. 1, 36 n. 45, 65 S.Ct. 918, 935 n. 45, 89 L.Ed. 1441 (1945); *Williams v. North Carolina,* 317 U.S. 287, 292, 63 S.Ct. 207, 210, 87 L.Ed. 279 (1942). Accordingly, defendant is granted a new trial.

---

**17.** This is not to say, however, that a failure to reveal the submission of a prior RTD application can never be material. In other circumstances, or on a different record, the standard might well be met.